**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**CURT KRAMER,**
**POWER UP LENDING GROUP, LTD.,**
**GENEVA ROTH REMARK HOLDINGS, INC.,**
**and 1800 DIAGONAL LENDING, LLC,**

**Defendants.**

**Civil Action No. 1:24-cv-03498**

**Jury Trial Demanded**

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") for its complaint against

Defendants Curt Kramer ("Kramer"), Power Up Lending Group, Ltd. ("Power Up"), Geneva

Roth Remark Holdings, Inc. ("Geneva Roth"), and 1800 Diagonal Lending, LLC ("1800

Diagonal," collectively with Power Up and Geneva Roth, the "Entity Defendants"), alleges as

follows:

## SUMMARY

1.      From at least January 2018 through at least March 2023 (the "Relevant Period"),

Defendant Kramer, a two-time recidivist violator of the federal securities laws, and his wholly

owned businesses Power Up, Geneva Roth, and 1800 Diagonal acted as securities dealers

notwithstanding the fact that they were not registered as dealers with the SEC and did not

otherwise comply with the dealer registration requirements of Section 15(a) of the Securities

Exchange Act of 1934 ("Exchange Act").

2.      The Entity Defendants—which are wholly funded, directed, controlled by

Kramer—operated a simple business model during the Relevant Period.  First, they purchased

convertible notes and convertible preferred stock ("convertible securities") directly from microcap issuers.  Then they converted the convertible securities into billions of newly issued free trading shares of common stock at a steep, contractually-guaranteed discount to the then-current market prices.  They held virtually none of the shares for appreciation.  Instead, they quickly sold the shares—which had never before traded publicly—into the public markets almost immediately following conversion.

3.      During the Relevant Period, Defendants funded approximately 325 microcap issuers in nearly 2,000 convertible securities transactions and converted those securities into more than 90 billion shares of newly issued common stock.  Defendants quickly sold the shares. They obtained more than $75 million in profits from these transactions as of March 31, 2023. The overwhelming majority of their profits—at least $60 million—came from converting notes and preferred shares and selling the newly issued post-conversion shares into the public markets, not from cash payments of interest and dividends.  Specifically, through March 31, 2023, on convertible securities purchased during the Relevant Period, Power Up earned net trading profits of approximately $39 million, Geneva Roth earned net trading profits of more than $14 million, and 1800 Diagonal earned net trading profits of approximately $7 million.

4.      Defendants' conduct was for the exclusive benefit of their own accounts and Defendant Kramer.  Kramer funded the Entity Defendants' activity, and at all times controlled their operations and had final authority over their financial decisions.  His actions committed the Entity Defendants to the initial investments.  He signed the securities purchase agreements ("SPAs") pursuant to which the Entity Defendants purchased convertible securities.  He signed the notices to convert the convertible securities into newly issued, free-trading shares.  He controlled the Entity Defendants' bank accounts that funded the transactions.  He controlled the

brokerage accounts into which post-conversion shares were deposited and from which they were sold.

5.      Kramer and the Entity Defendants remain active with at least two Entity Defendants continuing to act as unregistered dealers after March 31, 2023.  Upon information and belief, Geneva Roth and 1800 Diagonal held hundreds of convertible securities that were not yet conversion-eligible as of March 31, 2023.  They continued to convert those securities, sell the post-conversion shares, and generate millions more in profits after March 31, 2023.  Upon information and belief, Geneva Roth and 1800 Diagonal, acting through Kramer, continue to purchase convertible securities from microcap issuers, convert them into newly issued shares of common stock at a discount, and sell the shares publicly.

## **VIOLATIONS**

6.      By virtue of the conduct alleged in this Complaint, Defendants violated Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)]. Additionally, Kramer is liable as a control person pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for Power Up's, Geneva Roth's, and 1800 Diagonal's violations of Exchange Act Section 15(a)(1).

7.      Unless Defendants are restrained and enjoined, they will continue to engage in the acts, practices, transactions, and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar type and object.

8.      The SEC seeks injunctive relief, disgorgement, prejudgment interest, civil penalties, and other appropriate and necessary equitable relief, including penny stock bars as to each Defendant.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action, and venue lies in this District,

pursuant to Exchange Act §§ 21(d) and 27 [15 U.S.C. §§ 78u(d) and 78aa], and 28 U.S.C.

§ 1331.  Defendants engaged in transactions, acts, practices, and courses of business in this

District during the Relevant Period.  Defendants' sales of post-conversion shares of issuer stock

occurred in the over-the-counter markets operated by OTC Markets Group, Inc., which is located

in this District.

10.      Each Defendant executed tolling agreements with the SEC preserving the

timeliness of the conduct alleged in this Complaint.

## DEFENDANTS

11.      **Curt Kramer**, age 50, resided in Jericho, New York, during the Relevant Period.

Kramer is a former registered representative, who held Series 7 and 63 licenses between January

1998 and July 2002, during which time he worked for seven registered broker-dealers.  Kramer is

a recidivist violator of the federal securities laws, having twice agreed, on a no-admit / no-deny

basis, to settled SEC administrative actions finding that he and entities he controlled engaged in

the illegal sale of unregistered penny stocks in violation of Securities Act Sections 5(a) and 5(c).[1]

Kramer has never registered with the SEC as a dealer and, during the Relevant Period, was not

associated with a SEC-registered dealer.

12.      **Power Up Lending Group, Ltd.,** formerly known as Empower Lending Group,

Ltd., is registered with the Virginia State Corporation Commission ("Virginia SCC") as a stock

corporation and is registered with the New York Department of State Division of Corporations as a

---

[1] *In the Matter of Curt Kramer and Hope Cap., Inc*., Sec. Act Rel. No. 10239, 2016 WL
11471986 (Oct. 27, 2016); *In the Matter of Curt Kramer, Mazuma Corp., Mazuma Funding
Corp., and Mazuma Holding Corp*., Sec. Act Rel. No. 9485, 2013 WL 6157152 (Nov. 25, 2013).

foreign business corporation.  Power Up's principal place of business is in Great Neck, New

York.  Kramer is, and at all relevant times was, the CEO and sole owner of Power Up.  Power Up

has never registered with the SEC as a securities dealer.

13.     **Geneva Roth Remark Holdings, Inc.,** is a New York domestic business

corporation formed on March 21, 2014, with its principal place of business in Great Neck, New

York.  Geneva Roth shares office space with Power Up.  Kramer is, and at all relevant times was,

the President and sole owner of Geneva Roth.  Geneva Roth has never registered with the SEC as

a securities dealer.

14.     **1800 Diagonal Lending, LLC,** formerly known as Sixth Street Lending, LLC,

is registered with the Virginia SCC as a limited liability company, with a principal place of

business in Alexandria, Virginia.  1800 Diagonal was formed on October 18, 2021.  From

October 18, 2021 through the present, Kramer was the sole member and manager of 1800

Diagonal, and held himself out as its CEO.  1800 Diagonal has never registered with the SEC as

a securities dealer.

## FACTS

### Kramer Controlled the Entity Defendants
### Including Their Daily Operations

15.     Kramer conducted his business through at least three different entities—Power

Up, Geneva Roth, and 1800 Diagonal—during the Relevant Period.

16.     The Entity Defendants were legally separate entities, but, in practice, there was

little formal distinction between them.  Kramer was the sole owner of each Entity Defendant and

the funds used by each business were his alone.  Kramer testified under oath in the SEC's

investigation that the decision to use one Entity Defendant over another for a transaction was

often arbitrary, because the Entity Defendants' funds were all his.

17.     During the Relevant Period, Kramer initially conducted most of the business through Power Up, but in January 2018, Geneva Roth began to fund microcap issuers though convertible notes and convertible preferred shares as well.  By late July 2022, Power Up generally stopped purchasing convertible notes from issuers, and Kramer principally operated his business through Geneva Roth and 1800 Diagonal.

18.     Kramer had the ultimate decision-making power over the Entity Defendants, including whether to execute a SPA and enter into a convertible securities transaction, the amount to fund, and the specific terms of each transaction.  He, personally or through employees that he directed, negotiated the terms of the convertible notes and preferred shares that the Entity Defendants purchased from microcap issuers (as well as amendments to the original terms).  He signed the SPAs on behalf of each Entity Defendant, as well as the conversion notices through which each of them converted notes and preferred shares into common stock.  He opened the bank and brokerage accounts through which the Entity Defendants conducted their businesses and was, during the Relevant Period, the principal authorized person on each of those accounts. The Entity Defendants' employees operated under Kramer's direction.

19.     The Entity Defendants shared approximately ten full and part-time employees during the Relevant Period.  After 1800 Diagonal was created in 2021, Kramer and some employees split a portion of their time between the Power Up and Geneva Roth offices in New York and the 1800 Diagonal office in Virginia.

### Defendants Held Themselves Out As
### Engaged in the Business of Buying and Selling Securities

20.     As alleged in Paragraphs 21 to 26, at all relevant times, Kramer and the Entity Defendants held themselves out to the public as being willing to engage in convertible securities transactions.

21.     For example, the Entity Defendants directly solicited publicly traded microcap issuers by cold calling and emailing issuer representatives and explaining the benefits of a convertible securities transaction.

22.     Employees of the Entity Defendants, acting at Kramer's direction, also periodically traveled across the United States to cities that were hosting conferences relevant to microcap companies, where they hosted existing and prospective customers at dinners or meet-and-greets and sought to generate additional convertible securities business.

23.     Kramer and his employees, including his brother, also met with issuers' representatives in person to discuss the issuer's financing needs and generate additional convertible securities business.  Kramer and his employees often used the bar at the St. Regis New York hotel in midtown Manhattan to hold such meetings with senior executives of microcap companies.

24.     Additionally, Kramer developed a reputation for being a source of convertible financing and issuers routinely reached out to Kramer and the Entity Defendants directly, or through consultants and finders, to solicit Kramer's interest in making convertible securities investments.

25.     Kramer instructed employees to inform issuers' representatives that the Entity Defendants' "most popular funding program" is through a convertible note or other convertible transaction.  For example, on behalf of Power Up and Geneva Roth, employees routinely emailed issuers' representatives after a call with the following or similar information:

> Our most popular funding program is to fund publicly traded companies in exchange for a restricted Rule 144 stock transaction at a discount to market only applicable at the time of conversion.  The note amount cannot be converted into common shares of stock or traded into the open market before a six month (180 days) holding period has expired.  The mechanism used for this capital investment

is by way of a convertible note to the company in essence, an unsecured debenture.

26.　During the Relevant Period, the majority of Defendants' convertible securities business came from repeat customers—issuers that Kramer had previously funded through the purchase of convertible notes or convertible preferred shares.

### Defendants' Convertible Note and Preferred Share Transactions Were Securities Transactions at Every Step

27.　Defendants' convertible note and convertible preferred share transactions were functionally similar and began with an Entity Defendant entering in a SPA with an issuer. Kramer personally executed each SPA on behalf of the relevant Entity Defendant.

28.　In the SPAs, the Entity Defendants represented that they were purchasing both: 1) a note or preferred stock and 2) the shares of common stock (collectively defined by the SPAs as "Securities") that would be issued upon conversion of the note or preferred shares, for the Entity Defendant's own account.

29.　The SPAs represented that the issuers were selling the "Securities" to the Entity Defendant in reliance on an exemption from the federal and state securities laws requirements to register the offer or sale of securities.

30.　In the SPAs, the Entity Defendants agreed that the "Securities" could not be resold unless registered for sale under an effective registration statement or the Entity Defendant provided the issuer with an opinion of counsel that the sale of the Securities qualified for an exemption from registration, such as Securities Act Rule 144, 17 C.F.R. § 201.144.

31.　Pursuant to the SPAs, the underlying note, preferred shares, and any pre-conversion shares of common stock reserved by the issuer were required to bear a restrictive legend such as the following:

THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE PLEDGED, SOLD, ASSIGNED, HYPOTHECATED OR OTHERWISE TRANSFERRED UNLESS (1) A REGISTRATION STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR (2) THE ISSUER OF SUCH SECURITIES RECEIVES AN  OPINION OF COUNSEL TO THE HOLDER  OF SUCH SECURITIES, WHICH COUNSEL AND OPINION ARE REASONABLY ACCEPTABLE TO THE ISSUER'S TRANSFER AGENT, THAT SUCH SECURITIES MAY BE PLEDGED, SOLD, ASSIGNED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.

32.     The convertible notes bore a similar restrictive legend but also stated that:

NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

33.     The SPAs required issuers to comply with the reporting requirements of the Securities Exchange Act of 1934 because compliance was relevant to Defendants' ability to use certain exemptions from transaction registration requirements when selling post-conversion shares of common stock.

34.     The SPAs also included a "use of funds" provision that required the issuer to use the proceeds of the note or preferred shares for general working capital purposes.

35.     The SPAs remained largely unchanged during the Relevant Period and were used, as standard practice, by all Entity Defendants during the Relevant Period, for the purchase of all forms of convertible securities.

36.     Within days after receiving an executed SPA from the issuer, the underlying transactions closed, and Kramer authorized the Entity Defendants to wire funds to the issuer for the purchase of the convertible note or convertible preferred shares.  The funds wired were less

than the note principal or the stated value of the preferred shares because the Entity Defendants added the cost of having lawyers prepare the documents, and any other upfront fees imposed by the convertible securities, to the note principal or preferred share value.

37.     As to the convertible notes that Defendants purchased during the Relevant Period, in general, the notes had:

    a.    a one-year maturity date;

    b.    principal amounts between $25,000 and $250,000;

    c.    interest rates between 8% and 12%;

    d.    steep prepayment penalties of between 25% and 45%; and

    e.    a requirement that the issuer instruct its transfer agent to reserve a sufficient number of authorized but unissued shares of common stock to provide for issuance of those shares upon full conversion of the note.

The notes' conversion terms significantly favored the Entity Defendants and typically gave each Entity Defendant the unilateral right to convert the note, in full or part, into newly issued shares of the issuer's common stock, after 180 days.  The conversion discounts ranged from 10% to 50% (but most commonly between 25% to 42%) off of the lowest closing bid price during the 15 to 20 days before the Entity Defendant issued a conversion notice.

38.     As to the convertible preferred shares that Defendants purchased during the Relevant Period, in general, the preferred shares had:

    a.    a stated value of $1 per share, resulting in the Entity Defendant owning the number of preferred shares associated with its initial investment plus additional shares to account for fees and other expenses (e.g., a $100,000 investment in preferred shares generally resulted in the Entity Defendant

receiving 100,000 convertible preferred shares, plus additional shares to cover fees and expenses);

b.   dividends that accrued at an annual rate of at least 8%; and

c.   redemption rights for the issuer that, if exercised within the first 180 days, subjected the issuer to penalties of between 7% to 34% depending on when the rights were exercised.

The certificate of designation for the preferred shares typically gave each Entity Defendant the unilateral right to convert its preferred shares, in full or part, into newly issued shares of the issuer's common stock after 180 days, and prohibited issuer redemptions after 180 days.  The conversion discounts typically were 25% to 35% off of the lowest closing bid price during the 15 to 20 days before the Entity Defendant issued a conversion notice.  Issuers were required to reserve from their authorized but unissued common stock a sufficient number of shares to provide for issuance of those shares upon full conversion of all preferred shares.  The preferred shares had no voting rights.

39.     Kramer typically initiated the conversion process shortly after the 180-day mark. He personally, or through employees acting at his direction, controlled the entire process.

40.     Each conversion notice, signed by Kramer, was accompanied by an opinion letter in which the Entity Defendant's attorney opined that the Rule 144 exemption from registration, 17 C.F.R. § 201.144, had been met and that the requested shares of common stock could be issued to the Entity Defendant without a restrictive legend.  Rule 144 enables non-affiliates that have acquired an issuer's restricted securities in a private transaction to resell the securities free of restriction into the public markets after satisfying certain conditions, including after observing a six-month (180 day) holding period following the date of acquisition.

41.     Kramer has publicly explained the structure of his convertible securities transactions and his reason for advancing funds to microcap issuers in sworn affidavits filed in court proceedings in which Entity Defendants have sued issuers for defaulting on a note.  These prior sworn explanations demonstrate that Defendants entered into these transactions with the aim and goal of obtaining and distributing publicly large quantities of free-trading stock.  For example, in *Power Up Lending Grp., Ltd. V. Quantum Energy, Inc.*, 2:21-cv-01836 (E.D.N.Y.) (ECF No. 5-1 at ¶ 8), Kramer explained that the acquisition of free trading stock was at the heart of the transactions.  His purpose in funding the issuer was to obtain free-trading stock at a pre-set discount to sell on the over-the-counter market for a profit.  He stated that he would never have lent funds to the issuer if Power Up could not obtain free trading stock.   In *1800 Diagonal Lending LLC v. American Int'l Holdings Corp.*, 1:23-cv-01150 (E.D.V.A.) (ECF No. 24-2 at ¶¶ 39, 41-44), Kramer similarly stated that the conversion right was an essential element of the transaction because all parties knew and expected that the issuer could not pay its obligation other than by converting the note into free trading stock, so that 1800 Diagonal could sell the stock on the open market.

42.     The Entity Defendants, acting through Kramer, typically converted notes and preferred shares into shares of common stock in multiple tranches.  Kramer, or employees acting under his direction, then worked with the issuer's transfer agent to have the post-conversion shares issued and deposited into the Entity Defendants' brokerage accounts as quickly as possible, which sometimes included paying rush fees to expedite this process.

43.     The Entity Defendants' practice was to sell the post-conversion shares continuously, on a daily or near-daily basis, until all the shares from that conversion tranche were sold.  Converting notes in tranches was a way for Kramer to insulate the Entity Defendants

from market price movements and to capture as much of the discount feature as possible. Each conversion was based on a discount to the then-prevailing market price (as defined in each note or preferred share), and if the market price had decreased since the last conversion, the next conversion was priced based on a discount to the diminished price.

44.     Defendants' sales frequently led to a significant decrease in the issuer's stock price. The conduct also significantly diluted the holdings of existing shareholders.

45.     Defendants frequently reaped large trading profits from their sale of post-conversion common stock. Defendants profits generally came from the discounted conversion price that they had negotiated with the issuers.

46.      Overall, with respect to the nearly 2,000 convertible securities transactions entered into during the Relevant Period, representing approximately $135 million of funding by the Entity Defendants, issuers repaid approximately $66 million of principal, accrued interest, and penalties in cash as of March 31, 2023, and the Entity Defendants converted approximately $75 million of  principal, accrued interest, and penalties into more than 90 billion shares of newly issued common stock.

47.      The Entity Defendants sold those approximately 90 billion newly issued shares into the public markets, generating gross sales proceeds of at least $120 million and net trading profits of at least $60 million as of March 31, 2023.

48.      On all convertible securities purchased during the Relevant Period, Defendants' total profits as of March 31, 2023 were approximately $75 million, more than 75% of which (*i.e.*, $60 million of the $75 million) was derived from the purchase and sale of securities.

49.     Specifically, Power Up, through Kramer, executed approximately 1,000 SPAs from January 1, 2018 through July 2022 through which Power Up provided microcap issuers

with approximately $70 million in funding in exchange for convertible securities.  As of March 31, 2023, Power Up had converted approximately 58% of such convertible securities, representing over $42 million in principal, accrued interest, and penalties, into more than 50 billion unrestricted, newly issued shares of issuer common stock.  Through March 31, 2023, Power Up sold those shares for gross proceeds of more than $75 million, and net trading profits of approximately $39 million.  Coupled with cash repayments received on some of the convertible securities, Power Up's total profits on the transactions were at least $50 million as of March 31, 2023, more than 75% of which was derived from the purchase and sale of securities.

50.     Although Power Up has not purchased convertible securities since July 2022, Kramer continues to control Power Up.  He testified in the SEC's investigation that he could decide to use any of his businesses, including Power Up, for future convertible securities transactions.

51.     Geneva Roth, through Kramer, executed approximately 450 SPAs from January 1, 2018 through March 31, 2023, through which Geneva Roth provided microcap issuers with approximately $30 million in funding in exchange for convertible securities.  As of March 31, 2023, Geneva Roth had converted approximately 65% of such convertible securities, representing approximately $20 million in unpaid principal, accrued interest, and penalties. Those amounts converted into approximately 20 billion unrestricted newly issued shares of issuer common stock.  Through March 31, 2023, Geneva Roth sold those shares for gross proceeds of approximately $32 million, and net trading profits of more than $14 million. Coupled with cash repayments received on some of the convertible securities, Geneva Roth's total profit on the transactions was at least $17 million as of March 31, 2023, at least 80% of which was derived from the purchase and sale of securities.

52.     Upon information and belief, including trade blotters produced by broker-dealers, Geneva Roth generated additional revenues and profits on convertible securities purchased prior to March 31, 2023, that were not yet conversion-eligible as of March 31, 2023.

53.     Upon information and belief, Geneva Roth has also executed SPAs and purchased and converted additional convertible securities since March 31, 2023.  For example, in its Form 10-Q for the quarter ended September 30, 2023, Star Alliance International Corp. (ticker: STAL) disclosed that it sold Series C preferred stock to Geneva Roth during the quarter. In its Form 10-Q for the quarter ended December 30, 2023, it disclosed that Geneva Roth converted notes into shares of common stock from October 16 through November 9, 2023, and had converted preferred shares into common stock during the same quarter.

54.     1800 Diagonal, though Kramer, executed approximately 410 SPAs from October 2021 through at least March 2023, through which it provided approximately $30 million in funding to microcap issuers in exchange for convertible securities.  As of March 31, 2023, 1800 Diagonal had converted approximately 44% of such convertible securities, representing approximately $12 million in unpaid principal, accrued interest, and penalties.  It received more than 16 billion newly issued shares of common stock.  Through March 2023, 1800 Diagonal sold those shares for gross proceeds of approximately $18 million, and net trading profits of approximately $7 million.  Coupled with cash repayments received on some of the convertible securities, 1800 Diagonal's total profit on the transactions was approximately $9 million as of March 31, 2023, approximately 75% of which was from the purchase and sale of securities.

55.     As of March 31, 2023, approximately half of the convertible securities that 1800 Diagonal had purchased prior to that date, were not yet eligible for conversion.  Upon information and belief, including based on trade blotters produced by broker-dealers, 1800

Diagonal converted material numbers of these securities and sold the post-conversion shares of common stock after March 31, 2023, generating additional revenues and profits.

56.     Upon information and belief, 1800 Diagonal has also continued since March 31, 2023 to execute SPAs and to purchase and convert additional convertible securities.  For example, in its Form 8-K filed with the SEC on March 7, 2024, C-Bond Systems, Inc. (ticker: CBNT) disclosed that, on March 1, 2024, it executed a SPA and convertible note with 1800 Diagonal, for $157,000.

57.     Beginning in October 2021, and continuing through at least March 2023, 1800 Diagonal gradually began to purchase a type of convertible note that required issuers to make monthly payments and granted 1800 Diagonal the right to convert the note only upon the occurrence of an event of default ("default convertible notes").  1800 Diagonal entered into at least 85 SPAs to acquire default convertible notes prior to March 31, 2023, representing approximately 20% of the volume of 1800 Diagonal's convertible securities business during that period.

58.     1800 Diagonal purchased these default convertible notes by first executing an SPA in substantially the same form that it used to purchase other convertible notes.  The SPAs define the default convertible notes and the shares of common stock to be issued after a conversion as "Securities."  The SPAs expressly state that the notes and common stock are being sold to 1800 Diagonal pursuant to an exemption from registration under the federal securities law.  The notes and underlying shares of common stock also carry a restrictive legend that precludes their resale unless a registration statement is in place or an exemption from registration is available.  Similar to the terms of the majority of convertible notes purchased by 1800 Diagonal during the Relevant Period , when default convertible notes convert, they convert into

newly issued shares of the issuer's common stock, at a significant discount to the issuer's trading price (at least 25%).

59.     Through March 2023, 1800 Diagonal has converted at least 15% of these notes into more than one billion shares of newly issued common stock and sold such shares into the public markets.

60.     Upon information and belief, including trade blotters produced by broker-dealers, issuers have continued to default on a material number of the default convertible notes since March 2023, and 1800 Diagonal has continued to convert them at substantial discounts to the market price, resulting in the distribution of billions more shares of common stock into the public markets.

**Illustrative Transactions by the Defendants**

61.     The following paragraphs highlight the history of Defendants' securities transactions with three microcap issuers during the Relevant Period, exemplifying how Defendants engaged in the regular business of buying and selling securities for their own accounts, notwithstanding their failure to register as securities dealers or, in Kramer's case, to associate with a registered securities dealer:

**Bantec, Inc. (Ticker: BANT, formerly DRUS)**

62.     From at least October 5, 2017 through January 13, 2022, Kramer executed SPAs pursuant to which the three Entity Defendants purchased a total of 19 convertible note obligations of Bantec, Inc. (Ticker: BANT), with a total principal amount of $1,108,000. Kramer authorized each Entity Defendant to disburse funds from their bank accounts to fund these notes.

63.     Bantec, a regular client of the Entity Defendants, is a Delaware corporation that principally conducts its business from Little Falls, New Jersey. Until May 2018, Bantec went by

the name Drone USA, Inc. (Ticker: DRUS), located in West Haven, Connecticut, and until

February 2019, it went by the name Bantek, Inc. (Ticker: DRUS), located in Pinebrook, New

Jersey.  During the period relevant to the Defendants' conversions, Bantec's stock qualified as a

"penny stock" as defined by Exchange Act Rule 3a51-1 and was traded on the OTC Markets

bulletin board ("OTC BB") or OTC Markets Pink.

      64.    The following chart lists the Bantec (or predecessor company) notes and the

specific Entity Defendant that purchased each note during the Relevant Period and includes one

note from 2017 that was converted during 2018:

| Date of Note | Date Funded | Entity Defendant | Principal | Term | Interest Rate | Conversion Discount |
|---|---|---|---|---|---|---|
| 10/5/2017 | 10/10/2017 | Power Up | $100,000 | 9 months, 10 days | 10% | 35% |
| 1/3/2018 | 1/9/2018 | Power Up | $53,000 | 9 months, 2 days | 10% | 35% |
| 3/5/2018 | 3/9/2018 | Power Up | $53,000 | 9 months, 10 days | 10% | 35% |
| 4/20/2020 | 4/23/2020 | Geneva Roth | $60,000 | 12 months | 10% | 42% |
| 6/9/2020 | 6/12/2020 | Geneva Roth | $53,000 | 12 months | 10% | 42% |
| 7/10/2020 | 7/15/2020 | Geneva Roth | $53,000 | 12 months | 10% | 42% |
| 8/28/2020 | 9/1/2020 | Geneva Roth | $104,000 | 12 months | 10% | 42% |
| 11/2/2020 | 11/6/2020 | Geneva Roth | $53,500 | 12 months | 10% | 40% |
| 12/15/2020 | 12/18/2020 | Geneva Roth | $43,500 | 12 months | 10% | 40% |
| 1/12/2021 | 1/19/2021 | Geneva Roth | $53,500 | 12 months | 10% | 35% |
| 2/15/2021 | 2/18/2021 | Geneva Roth | $53,500 | 12 months | 10% | 35% |
| 3/11/2021 | 3/15/2021 | Geneva Roth | $53,500 | 12 months | 10% | 35% |
| 5/3/2021 | 5/4/2021 | Geneva Roth | $58,500 | 12 months | 10% | 35% |
| 6/14/2021 | 6/17/2021 | Geneva Roth | $58,500 | 12 months | 10% | 35% |
| 7/19/2021 | 7/20/2021 | Geneva Roth | $53,750 | 12 months | 10% | 35% |

| Date of Note | Date Funded | Entity Defendant | Principal | Term | Interest Rate | Conversion Discount |
|---|---|---|---|---|---|---|
| 8/19/2021 | 8/19/2021 | Geneva Roth | $41,250 | 12 months | 10% | 35% |
| 9/17/2021 | 9/21/2021 | Geneva Roth | $50,000 | 12 months | 10% | 35% |
| 11/12/2021 | 11/17/2021 | 1800 Diagonal | $55,000 | 12 months | 10% | 35% |
| 1/3/2022 | 1/13/2022 | 1800 Diagonal | $50,000 | 12 months | 10% | 35% |

65.     Although 1800 Diagonal had already begun to purchase some default convertible notes from issuers in October 2021, the two notes it purchased from Bantec after that date were in the standard convertible note format that Kramer had used throughout the Relevant Period.

66.     Each Bantec note had a 10% interest rate and typically a 1-year maturity, with the exception of the notes purchased by Power Up, which had maturity periods of 9 months and a few days.

67.     Each Bantec note granted the Entity Defendant the unilateral right, beginning 180 days after the date of note, to convert the unpaid principal and interest, in full or part, into common stock at a discount.  The conversion rates were highly favorable to the Entity Defendants.  Power Up and 1800 Diagonal were entitled to convert their Bantec notes into common stock at a 35% discount to the "Market Price," defined as the average of the two lowest closing bid prices for the issuer's common stock during the 15-day period prior the date of the conversion notice.  Geneva Roth was entitled to convert its Bantec notes into common stock at a 35% to 42% discount to the "Market Price," defined, depending on the note, as the lowest closing bid price for the issuer's common stock during the 20-day period prior to the date of Geneva Roth's conversion notice or the average of the two lowest closing bid prices for the issuer's common stock during the 15-day period prior to the date of the conversion notice.

68.     The conversion rate for each note was variable and, if an Entity Defendant converted a note in parts over time, the conversion rate was recalculated on the date of each new conversion.  Regardless of whether Bantec's stock price rose or fell since the prior conversion, the Entity Defendant converted the note (or parts thereof) at a 35% to 42% discount to the then-current Market Price.

69.     Each of the notes contained the following restrictive legend:

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

70.     The course of conduct alleged in Paragraphs 71 to 72, and the note terms themselves, show that the Entity Defendants purchased Bantec's notes with an eye toward converting them and distributing newly issued shares of Bantec's common stock into the public markets.

71.     With the exception of Geneva Roth's August 19, 2021 Bantec note, which was repaid by Bantec, the Entity Defendants began to convert every note identified in Paragraph 64 soon after the 180th day and completed the conversions before any note had reached its maturity date.  Kramer personally signed the conversion notices.

72.     In total, the Entity Defendants, through Kramer, converted 18 of the 19 notes identified in Paragraph 64 on at least 42 separate occasions.  In so doing, the Entity Defendants collectively received more than 1 billion newly issued shares of Bantec common stock.

73.     The course of conduct alleged in Paragraphs 74 to 76 show that the Entity Defendants did not convert the Bantec notes to hold the shares for appreciation.  They converted the notes instead to promptly sell the shares into the public markets and capture as much of the spread between the discounted conversion prices and the public market prices as possible.

74.     Shortly after the shares from each conversion were deposited into the Entity Defendants' brokerage accounts, the Entity Defendants' brokerage firms, acting under instructions from Kramer, began to sell the newly-converted, newly issued Bantec shares on the over-the-counter markets.

75.     On average it took the Entity Defendants approximately four days from the date of the conversion notice to receive the Bantec shares into their accounts and complete the sale of all shares associated with the conversion. On a majority of the trading dates, the Entity Defendants' sales constituted more than 25% of the total trading volume in Bantec common stock that day.

76.     Power Up's, Geneva Roth's, and 1800 Diagonal's sales of Bantec shares collectively generated trading profits of more than $1.6 million (approximately $135,000 for Power Up, approximately $1.5 million for Geneva Roth, and approximately $45,000 for 1800 Diagonal) which were largely attributable to the spread between the discounted conversion prices and the prevailing market prices at the time of sales.

77.     Bantec reported 43 million total outstanding shares of common stock as of February 14, 2018, before the Entity Defendants converted any Bantec notes.  Between April

2018 and September 2018, Power Up converted three notes into more than 49 million shares and sold those shares into the public markets.  Those shares underwent a 1:1000 reverse split in February 2020.  Then, from October 2020 to March 2022, Geneva Roth converted 13 notes into more than 590 million shares.  From May 2022 to July 2022, 1800 Diagonal converted two notes into more than 410 million shares.  Both sold the shares into the public markets within days following the conversions.  Bantec reported more than 4.3 billion total outstanding shares of common stock as of August 11, 2022, nearly 24% of which Defendants had distributed into the public markets through their sale of post-conversion shares, despite never having registered as dealers.

### PCT Corp. (Ticker: PCTL)

78.      From at least June 5, 2018 through June 15, 2022, Kramer executed SPAs pursuant to which Power Up and 1800 Diagonal purchased a total of 21 convertible note obligations of PCT Corp., Inc. (Ticker: PTCL), with a total principal amount of $1,578,250. Kramer authorized Power Up and 1800 Diagonal to disburse funds from their bank accounts to fund the PCT notes.

79.      PCT, a regular client of the Entity Defendants, is a Nevada corporation that principally conducts its business from Little River, South Carolina.  At all relevant times, PCT's stock qualified as a "penny stock" as defined by Exchange Act Rule 3a51-1 and was traded on the OTC Markets bulletin board (OTC BB) or OTC Markets Pink.

80.      The following chart lists the PCT notes and the specific Entity Defendant that purchased each note during the Relevant Period, along with the conversion discount and other terms:

| Date of Note | Date Funded | Entity Defendant | Principal | Term | Interest Rate | Conversion Discount |
|---|---|---|---|---|---|---|
| 6/5/2018 | 6/13/2018 | Power Up | $68,000 | 12 months | 12% | 39% |
| 7/25/2018 | 7/30/2018 | Power Up | $38,000 | 12 months | 12% | 39% |
| 8/27/2018 | 8/29/2018 | Power Up | $53,000 | 12 months | 12% | 39% |
| 12/5/2018 | 12/12/2018 | Power Up | $60,000 | 12 months | 12% | 39% |
| 1/15/2019 | 1/16/2019 | Power Up | $30,000 | 12 months | 12% | 39% |
| 2/21/2019 | 2/26/2019 | Power Up | $50,000 | 12 months | 12% | 39% |
| 4/29/2019 | 5/2/2019 | Power Up | $35,000 | 12 months | 12% | 39% |
| 10/7/2019 | 10/8/2019 | Power Up | $53,000 | 12 months | 12% | 39% |
| 10/29/2019 | 10/31/2019 | Power Up | $50,000 | 12 months | 12% | 39% |
| 3/2/2020 | 3/9/2020 | Power Up | $45,000 | 12 months | 12% | 39% |
| 4/9/2020 | 4/16/2020 | Power Up | $128,000 | 12 months | 12% | 39% |
| 5/8/2020 | 5/12/2020 | Power Up | $83,000 | 12 months | 12% | 39% |
| 9/21/2020 | 9/22/2020 | Power Up | $53,500 | 6 months | 12% | 39% |
| 2/22/2021 | 2/23/2021 | Power Up | $128,000 | 12 months | 12% | 39% |
| 3/26/2021 | 3/30/2021 | Power Up | $83,000 | 12 months | 12% | 39% |
| 4/5/2021 | 4/7/2021 | Power Up | $43,000 | 12 months | 12% | 39% |
| 5/3/2021 | 5/10/2021 | Power Up | $128,000 | 12 months | 12% | 39% |
| 11/4/2021 | 11/8/2021 | 1800 Diagonal | $226,162 | 12 months | 19% | 25% |
| 3/29/2022 | 4/4/2022 | 1800 Diagonal | $128,000 | 12 months | 12% | 39% |
| 6/1/2022 | 6/2/2022 | 1800 Diagonal | $53,000 | 12 months | 12% | 39% |
| 6/14/2022 | 6/15/2022 | 1800 Diagonal | $53,000 | 12 months | 12% | 39% |

81.     Only one of the four notes purchased by 1800 Diagonal from PTC—the November 4, 2021 note—was structured as a default convertible note.  The remaining were in the standard convertible note format that Kramer had used throughout the Relevant Period.

82.     With the exception of the November 4, 2021 note, the PCT notes identified in Paragraph 80 typically had a 12% interest rate and a 1-year maturity.  Each such note granted the Entity Defendant the unilateral right, beginning 180 days after the date of note, to convert the unpaid principal and interest, in full or part, into common stock at a discount.  The conversion rates were highly favorable to Power Up and 1800 Diagonal.  They were entitled to convert their PCT notes into common stock at a 39% discount to the "Market Price," defined as the lowest closing bid price during the 15-day period prior the date of the conversion notice.

83.     The November 4, 2021 default convertible note, which 1800 Diagonal purchased pursuant to a stock purchase agreement that Kramer executed, carried a 10% original issue discount and required the issuer to pay 1800 Diagonal an additional upfront fee equal to 11% of the principal on the first day.  1800 Diagonal was entitled to convert the note, in full or part, only upon the occurrence of an event of default.  If PCT opted to repay the note after an event of default, the payment obligation was increased to 150% of the unpaid principal plus interest and the amount became immediately due and payable.  In the event of a default, 1800 Diagonal was entitled to convert the note, in full or part, at a highly favorable 25% discount to the "Market Price," defined as the lowest closing bid price during the five trading days prior to the date of the conversion notice.

84.     All of the PCT notes, including the November 4, 2021 default convertible, bore a restrictive legend at the top that was materially similar to the legend for the Bantec notes reflected in Paragraph 69.  This legend identified the note as a security and restricted the sale or transfer of the note and underlying post-conversion securities.

85.     The course of conduct alleged in Paragraph 87, and the terms of the notes themselves, show that Power Up and 1800 Diagonal, acting through Kramer, purchased PCT's notes with an eye toward converting them and distributing newly issued shares of PCT's common stock into the public markets.

86.     PCT opted to prepay 13 of the notes before the 180-day mark.  The notes allowed prepayments up to 180 days after the note was purchased but imposed a steep pre-payment penalty equal to 12% to 37% of the outstanding principal and interest depending on how close to the 180 days mark the payment was made.  PCT pre-paid these notes shortly before the 180th

day, before the Entity Defendants' conversion right was triggered.  PCT incurred a 37% penalty on top of the principal and accrued interest.

87.     As of March 31, 2023, Power Up and 1800 Diagonal, acting through Kramer, had converted seven of the remaining PCT notes identified in Paragraph 80, including the November 14, 2021 default convertible note.  The notes were converted in increments on at least 34 separate occasions and Kramer signed the conversion notices.  The conversions began after the 180th day and were completed before the notes reached maturity.  Collectively, Power Up and 1800 Diagonal received more than 250 million newly issued shares of PCT common stock.

88.     The course of conduct alleged in Paragraphs 89 to 91 show that Power Up and 1800 Diagonal did not convert the PCT notes in order to hold the shares for appreciation.  They converted the notes instead to promptly sell the shares into the public markets and capture as much of the spread between the discounted conversion price and the public market price as possible.

89.     Shortly after the shares from each conversion were deposited into the Power Up and 1800 Diagonal brokerage accounts, their brokerage firms, acting under instructions from Kramer, began to sell the newly-converted, newly issued shares on the over-the-counter markets.

90.     On average it took Power Up and 1800 Diagonal approximately three days from the date of the conversion notice to receive the PCTL shares into their accounts and complete the sale of all shares associated with the conversion.  On a majority of the trading dates, Power Up's and 1800 Diagonal's sales constituted more than 30% of that day's total trading volume in PCT common stock.

91.     As of March 31, 2023, Power Up's and 1800 Diagonal's sales of PCT shares generated trading profits of more than $450,000 (more than $290,000 for Power Up and

$160,000 for 1800 Diagonal) which were achieved principally because of the spread between the discounted conversion prices and the prevailing market prices at the time of sales.

92.     PCT reported approximately 52 million total outstanding shares of common stock outstanding as of April 12, 2019, before the Entity Defendants converted any PCT notes. Between June 2019 and November 2019, Power Up converted the December 12, 2018 note and the January 16, February 26, and May 2, 2019 notes, into 177 million newly issued shares of PCT common stock which it then sold into the public markets.  PCT reported nearly 525 million total outstanding shares of common stock as of April 10, 2020, 33% of which Power Up had distributed into the public market marketplace, despite never having registered as a dealer.

93.     PCT reported approximately 790 million total outstanding shares of common stock outstanding as of May 11, 2022, before the Entity Defendants converted any additional PCT notes.  From late May 2022 through March 2023, 1800 Diagonal converted the November 8, 2021 default convertible note and the April 4 and June 2, 2022 convertible notes, into approximately 93 million newly issued shares of PCT common stock which it then sold into the public markets.  It was not registered as dealer when it did so.  Shortly thereafter, PCT became delinquent in its filings with the SEC, and it informed investors that it was not in a financial position to pay the estimated $90,000 it would cost to pay an auditor to audit its financials.

**Neutra Corp. (Ticker: NTRR)**

94.     Neutra Corp., a regular client of the Defendants, is a Wyoming corporation that principally conducts its business from Sugar Land, Texas.  During a portion of the Relevant Period, it was also based in Las Vegas, Nevada.  At all relevant times, Neutra Corp's stock qualified as a "penny stock" as defined by Exchange Act Rule 3a5-1 and was traded on OTC Markets QB.

95.     From at least October 10, 2018, through July 20, 2022, Kramer executed SPAs

pursuant to which Power Up and Geneva Roth (a) purchased six convertible note obligations

from Neutra Corp., in the principal amount of $355,000, and (b) purchased over 750,000 shares

of convertible preferred securities for $755,750.

96.     The convertible notes that Power Up purchased from Neutra Corp during the

Relevant Period are reflected in the following chart:

| Date of SPA | Date Note Funded | Entity Defendant | Principal | Term | Interest Rate | Conversion Discount |
|---|---|---|---|---|---|---|
| 10/10/2018 | 10/17/2018 | Power Up | $55,000 | 9 months, 20 days | 8% | 39% |
| 11/1/2018 | 11/9/2018 | Power Up | $103,000 | 9 months, 2 days | 8% | 39% |
| 12/18/2018 | 12/31/2018 | Power Up | $38,000 | 9 months, 23 days | 8% | 39% |
| 5/21/2019 | 6/6/2019 | Power Up | $63,000 | 9 months, 23 days | 8% | 39% |
| 7/31/2019 | 9/3/2019 | Power Up | $53,000 | 12 months | 8% | 39% |
| 11/4/2019 | 11/7/2019 | Power Up | $43,000 | 10 months, 12 days | 8% | 39% |

These notes typically had an 8% interest rate and a 9- to 12-month maturity.  Each note granted

Power up the unilateral right, beginning 180 days after the note purchase date, to convert the

unpaid principal and interest, in full or part, into common stock, at a 39% discount to the

"Market Price," defined as the lowest closing bid price during the 15-day period prior to the date

of the conversion notice.

97.     Power Up and Geneva Roth purchased from Neutra Corp. the convertible

preferred shares reflected in the following chart:

| Date of SPA | Date Funded | Entity Defendant | Cost | Shares Purchased | Dividend | Conversion Discount |
|---|---|---|---|---|---|---|
| 7/6/2020 | 7/17/2020 | Power Up | $103,000 | 115,000 | 8% | 29% |
| 9/2/2020 | 9/3/2020 | Power Up | $43,000 | 48,200 | 8% | 29% |
| 10/16/2020 | 10/19/2020 | Power Up | $33,000 | 37,000 | 8% | 29% |
| 1/20/2021 | 1/25/2021 | Power Up | $63,500 | 71,000 | 8% | 29% |
| 2/12/2021 | 2/17/2021 | Power Up | $78,500 | 87,900 | 8% | 29% |
| 3/16/2021 | 3/18/2021 | Power Up | $68,500 | 76,700 | 8% | 29% |

| Date of SPA | Date Funded | Entity Defendant | Cost | Shares Purchased | Dividend | Conversion Discount |
|---|---|---|---|---|---|---|
| 4/30/2021 | 5/18/2021 | Power Up | $43,750 | 49,000 | 8% | 29% |
| 6/21/2021 | 6/22/2021 | Power Up | $45,000 | 50,400 | 8% | 29% |
| 7/28/2021 | 8/3/2021 | Power Up | $53,750 | 59,600 | 8% | 29% |
| 8/17/2021 | 8/19/2021 | Power Up | $43,750 | 49,000 | 8% | 29% |
| 9/13/2021 | 9/17/2021 | Power Up | $53,750 | 60,200 | 8% | 29% |
| 10/19/2021 | 10/25/2021 | Power Up | $43,750 | 49,000 | 8% | 29% |
| 12/2/2021 | 12/8/2021 | Geneva Roth | $28,750 | 32,200 | 8% | 29% |
| *7/20/2022* | 7/20/2022 | Power Up | $53,750 | 60,200 | 8% | 29% |

These convertible preferred shares, which had no voting rights, typically accrued dividends at an annual rate of 8% and had a stated value of $1 per share. Neutra Corp. had the right to redeem all or a portion of the convertible shares for a premium ranging from 107% to 134% of the stated value of the holder's shares within the first 180 days after the shares were issued. Neutra Corp. could not redeem the preferred shares after 180 days. But, beginning at 180 days, Power Up and Geneva Roth had the unilateral right to convert all or part of their outstanding shares of convertible preferred stock into newly issued shares of Neutra Corp. common stock, at a 29% discount to "Market Price" of Neutra Corp.'s common stock, defined as the lowest closing bid price during the 15-day period prior to the date of the conversion notice. Neutra Corp. was required to reserve authorized but unissued shares of common stock for future conversions.

98.     Kramer authorized Power Up and Geneva Roth to enter into the convertible note and convertible preferred stock transactions with Neutra Corp. and to disburse funds from their bank accounts to fund these notes and preferred shares.

99.     The course of conduct alleged in Paragraphs 100 to 101, and the note and preferred share terms, show that Power Up and Geneva Roth, acting through Kramer, purchased Neutra Corp.'s convertible securities with an eye toward converting them and distributing newly issued shares of PCT's common stock into the public markets.

100.     In all, between May 9, 2019 and May 27, 2020, Power Up converted the unpaid

principal and interest on five of the six convertible notes with Neutra Corp. on approximately 60

occasions.  These conversions began soon after the 180th day and were completed before any of

the notes reached maturity date.  Kramer signed the conversion notices.  In so doing, Power Up

received more than 1 billion newly issued Neutra Corp. shares.  Only one note was repaid in

cash.

101.     Between January 22, 2021 and February 10, 2023, Power Up and Geneva Roth

converted every preferred share that they purchased, plus the dividends accrued thereon on 26

separate occasions.  Kramer signed the conversion notices soon after the 180th day.  In all, the

preferred shares were converted into more than 1 billion newly issued shares of Neutra Corp.

common stock.

102.     The course of conduct alleged in Paragraphs 103 to 105 show that Power Up and

Geneva Roth did not convert the Neutra Corp. convertible securities in order to hold the shares

for appreciation.  They converted the securities instead to promptly sell the shares into the public

markets and capture as much of the spread between the discounted conversion price and the

public market price as possible.

103.     Shortly after the shares from each conversion (including Geneva Roth's

conversions) were deposited into Power Up's brokerage account, Power Up began to sell the

newly-converted, newly issued Neutra Corp. shares on the over-the-counter markets.

104.     On average it took Power Up two to three days from the date of the Power Up and

Geneva Roth conversion notices to receive the shares in its account and sell the shares received

from each conversion. On a majority of the trading dates, Power Up's sales constituted more

than 25% of that day's total trading volume in Neutra Corp common stock.

105.    As of March 31, 2023, Power Up generated trading profits of approximately $1 million from its sale of newly issued Neutra Corp. shares into the public markets.  Its profits were largely attributable to the spread between the discounted conversion prices and the prevailing market prices at the time of the sales.

106.    Neutra Corp. reported approximately 40 million total outstanding shares of common stock outstanding as of May 1, 2019, before the Entity Defendants converted any Neutra Corp. convertible securities.  By June 24, 2020, after Power Up converted five of its six notes into more than 1 billion newly issued shares, Neutra Corp. reported total outstanding shares of nearly 1.4 billion.  Power Up sold those 1 billion shares into the public markets and thereby distributed more than 70% of Neutra Corp.'s total outstanding shares of June 24, 2020.  By June 6, 2023, after Power Up and Geneva Roth converted their preferred shares into more than 1.1 billion additional newly issued shares of Neutra Corp. common stock and Power Up sold those shares (including the Geneva Roth shares in NTRR) into the public markets, Neutra Corp. reported nearly 2.9 billion total outstanding shares of common stock.  Power Up and Geneva Roth had thereby publicly distributed more than 70% of Neutra Corp.'s total outstanding shares (2.1 billion out of 2.9 billion) as of June 24, 2023.

**Defendants Sold Penny Stock**

107.    During the Relevant Period, the Entity Defendants, acting through and under the control of Kramer, purchased, held, and sold 100's of billions of unrestricted, newly issued shares of common stock of microcap issuers.  At all times of relevant conversions and post conversion sales, the issuers did not meet any of the exceptions to the definition of "penny stock" set forth in Exchange Act Section 3(a)(51) and Exchange Act Rule 3a51–1.  *See* 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51-1.  Exchange Act Section 3(a)(51) and Exchange Act Rule 3a51-1.  [*See* 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51-1].  Defendants therefore

participated in the offering of penny stocks in connection with the actions they undertook to operate their convertible notes businesses.

## FIRST CLAIM FOR RELIEF
### Violations of Exchange Act § 15(a)(1)
### (*Against All Defendants*)

108.    The SEC re-alleges and incorporates by reference here the allegations in all the foregoing paragraphs.

109.    By engaging in the conduct described above, each Defendant made use of the mails or other means or instrumentalities of interstate commerce to effect transactions in, to induce, and to attempt to induce, the purchase and sale of securities for their own account as part of a regular business while not registered with the SEC as a dealer and when Defendant Kramer was not associated with an entity registered with the SEC as a dealer.

110.    By reason of the foregoing, each Defendant violated, and unless enjoined will likelyagain violate, Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)].

## SECOND CLAIM FOR RELIEF
### Violation, as a Control Person, of Section 15(a)(1) of the Exchange Act
### (*Against Defendant Kramer*)

111.    The SEC re-alleges and incorporates by reference here the allegations in all the foregoing paragraphs.

112.    As alleged above, Power Up, Geneva Roth, and 1800 Diagonal violated Exchange Act Section 15(a)(1).

113.    During the Relevant Period, Kramer controlled Power Up, Geneva Roth, and 1800 Diagonal and was a culpable participant in their violations of Exchange Act Section 15(a)(1).

114.    By reason of the foregoing, Kramer is liable as a controlling person pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for the violations of Exchange Act Section 15(a)(1) by Power Up, Geneva Roth, and 1800 Diagonal.

## **RELIEF REQUESTED**

WHEREFORE, the SEC respectfully requests that this Court issue a Final Judgment as to each Defendant:

### **I.**
### **Violations**

Finding that each Defendant violated the Federal securities laws as alleged against them in this Complaint.

### **II.**
### **Permanent Injunctions**

Permanently restraining and enjoining each Defendant and their members, managers, agents, servants, employees, attorneys-in-fact, and all persons in active concert or participation with them who receive notice of the injunction by personal service or otherwise, from acting as unregistered securities dealers, or failing to be associated with a registered dealer, in violation of Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)], and with respect to Defendant Kramer, enjoining him from controlling any person or entity that acts as an unregistered securities dealer in violation of Exchange Act Section 15(a)(1).

### **III.**
### **Penny Stock Bar**

Permanently restraining and enjoining each Defendant from participating in the offering of any penny stock, including by engaging in activities with a broker, dealer, or issuer for purposes of  issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)].

**IV.**
**Civil Penalties**

Ordering each Defendant to pay appropriate civil penalties under Exchange Act Section

21(d)(3) [15 U.S.C. § 78u(d)(3)].

**V.**
**Disgorgement of Ill-Gotten Gains**

Ordering each Defendant to disgorge, with prejudgment interest, all ill-gotten gains

received, directly or indirectly, from the activities set forth in this Complaint, pursuant to

Exchange Act §§ 21(d)(3)(A)(ii), (d)(5), and (d)(7) [15 U.S.C. §§ 78u(d)(3)(A)(ii), (d)(5) and

(d)(7)], and, as to Kramer, ordering him jointly and severally liable with each Entity Defendant.

**VI.**
**Cancellation and Surrender**

Ordering Defendants to surrender any conversion rights under any remaining

unconverted convertible notes, stocks, or other securities held by Defendants and surrender for

cancellation any unsold shares of common stock obtained by Defendants through the conversion

of convertible notes, stocks, or other securities, pursuant to Exchange Act §§ 21(d)(5) [15 U.S.C.

§§ 78u(d)(5)].

**VII.**
**Other Relief**

Granting such other and further relief as this Court may deem just, equitable, or necessary

in connection with the enforcement of the federal securities laws and for the protection of

investors.

**JURY DEMAND**

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, the SEC demands that this

case be tried before a jury.

Dated: May 7, 2024                          Respectfully submitted,

Of Counsel:                                 U.S. SECURITIES AND EXCHANGE COMMISSION
Stacy L. Bogert
Christopher M Bruckmann                          */s/Suzanne J. Romajas*
Stephen M. LeBlanc                          Suzanne J. Romajas
                                            Daniel T. Lloyd (*pro hac vice* to be filed)
                                            U.S. Securities and Exchange Commission
                                            100 F Street, NE
                                            Washington, DC 20549
                                            (202) 551-4473 (Romajas)
                                            (202) 551-3781 (Lloyd)
                                            RomajasS@sec.gov
                                            LloydD@sec.gov

                                            *Attorneys for Plaintiff*