**GIBSON DUNN**

Marshall R. King
T: +1 212.351.3905
M: +1 201.788.4374
mking@gibsondunn.com

July 9, 2024

VIA ECF

Hon. Edgardo Ramos
U.S. District Judge
U.S. District Court for the Southern District of New York
40 Foley Square
New York, NY 10007

Re:     SEC v. Kramer, No. 1:24-cv-03498-ER

Dear Judge Ramos:

We represent Defendants (collectively, Power Up Lending) in the above-referenced action. Pursuant to Rule 2.A.ii of Your Honor's Individual Practices, we respectfully request a pre-motion conference on Power Up Lending's anticipated motion to dismiss.

At the Supreme Court, *Chevron* has been overruled—but here, a sweeping, self-aggrandizing agency interpretation is proceeding full steam ahead. In this case, a sharply divided SEC presses a novel reinterpretation of a 90-year-old statutory term (the word "dealer") to attempt to impose indirectly a regulatory prohibition the agency tried—but failed—to impose directly.

In 2021, the SEC proposed to effectively repeal Rule 144(d)(3)(ii). *See* 86 Fed. Reg. 5063 (SEC Jan. 19, 2021). The rule, which codified agency guidance from 1980, *see* 72 Fed. Reg. 71,546, 71,555 & n.143 (SEC Dec. 17, 2007), facilitated what is known as convertible lending. In a convertible-lending transaction, the lender loans money to a public company in exchange for convertible debt. The borrower has the option to repay the debt in cash, *see, e.g.*, Compl. ¶ 46, but, as a form of collateral, offers the lender an option to convert unpaid portions of the loan into common stock, which the lender—in the words of the SEC—can "resell" to "recoup [its] capital," 62 Fed. Reg. 9242, 9243–44 (SEC Feb. 28, 1997); *see, e.g.*, Compl. ¶ 40. Because small public companies often lack other forms of collateral, 80 Fed. Reg. 71,388, 71,492 (SEC Nov. 16, 2015), convertible loans are often such companies' only source of affordable financing, 86 Fed. Reg. at 5073, which is why SEC rules have facilitated convertible lending for decades.

The current SEC, however, disfavors convertible lending, because the converted stock is not registered with the agency. So, in 2021, the SEC tried, effectively, to repeal Rule 144(d)(3)(ii). *See* 86 Fed. Reg. 5063. But, in the face of overwhelming opposition from public companies and members of Congress, *see, e.g.*, Letter from 63 Public Companies (Jan. 25, 2021), https://tinyurl.com/56vf78v2; Letter from Senator Tillis (June 9, 2021), https://tinyurl.com/398csf7d, the SEC abandoned the rulemaking route, *see* 87 Fed. Reg. 35,393, 35,395 n.11 (SEC June 10, 2022). Instead, it turned to enforcement. Even though SEC guidance says explicitly that convertible

# GIBSON DUNN

Hon. Edgardo Ramos  July 9, 2024
U.S. District Judge  Page 2

lenders operate "without being broker-dealers," *Acqua Wellington N. Am. Equities Fund*, SEC No-Action Letter, 2001 WL 1230266, at *5 n.10 (Oct. 11, 2001), the agency in this and other recent cases insists that convertible lending is "dealing" after all. Never mind that no convertible lender has ever registered as a "dealer"; that since 1995 borrowers have disclosed to the SEC over $30 billion in convertible loans—all by non-dealers; that the SEC itself has examined and otherwise audited some of the biggest convertible lenders—all non-dealers—on the planet, *see, e.g.*, SEC Mem. in Support of Mot. for Summ. J. at 1, *SEC v. Yorkville Advisors*, No. 1:12-cv-07728 (S.D.N.Y. Sept. 29, 2017), ECF No. 198; and that convertible lenders—all non-dealers—have repeatedly, and successfully, turned to the federal courts to enforce their agreements, *see, e.g.*, Compl. ¶ 41; *see also ATSI Commc'ns, Inc. v. Shaar Fund*, 493 F.3d 87, 106 (2d Cir. 2007). The SEC insists that convertible lenders, like Power Up Lending, are unregistered "dealers" anyway.

Astonishingly, the SEC brings this claim through some of the same attorneys who have personally reviewed Mr. Kramer's financing transactions for a decade, without once suggesting that Mr. Kramer was operating unlawfully as an unregistered dealer. *Compare, e.g.*, Compl. ¶ 5 (alleging that through convertible notes, Power Up Lending acquires "newly issued shares of common stock at a discount," and "sell[s] the shares"), *with Curt Kramer*, 2016 WL 11471986, at *1–2 (SEC Oct. 27, 2016) (acknowledging that through his financing transactions Mr. Kramer acquires stock at "discounts from market prices" and "promptly sell[s]" the stock); *see also Curt Kramer*, 2013 WL 6157152, at *1 (SEC Nov. 25, 2013) (similar).

One SEC Commissioner calls the SEC's about face "arbitrary and even tyrannical." *Statement of Comm'r Uyeda* (Feb. 6, 2024), https://tinyurl.com/mwpyys67; *see also Comm'r Uyeda Remarks to the Council of Institutional Investors* (Mar. 5, 2024), https://tinyurl.com/52vzk73u (warning that the law "would not have put these types of entities on notice of [the alleged] requirement to register as dealers"). And another explains that the agency's position "obliterates" decades of law. *Statement of Comm'r Peirce* (Feb. 6, 2024), https://tinyurl.com/yyk4ffe6. Commissioners Uyeda and Peirce are correct, and this case should be dismissed for two principal reasons.

## I. The SEC's Current Conception of "Dealing" is Contrary to Law.

The SEC insists Power Up Lending is "dealing" because it is "in the regular business of buying and selling securities," Compl. ¶ 61, *i.e.*, it buys convertible notes and sells the converted shares. But that cannot possibly be what "dealing" is. Under that definition, everyone who participates in the market is a dealer, so long as his "buying" and "selling" of securities is "regular."

Congress did not adopt such an "excessively broad definition," which "would embrace as a dealer every securities trader who makes money through buying and selling of securities." *SEC v. Federated Alliance Grp.*, 1996 WL 484036, at *5 (W.D.N.Y. Aug. 21, 1996); *accord Discover Growth Fund v. Camber Energy, Inc.*, 602 F. Supp. 3d 982, 988 (S.D. Tex. 2022) (similar). To the contrary, by the time Congress enacted the Exchange Act in 1934, the word "dealer" had acquired a settled meaning "limited"—in the words of the Supreme Court—"to one who . . . buys and sells securities *to customers*." *Schafer v. Helvering*, 299 U.S. 171, 174 (1936) (emphasis

**GIBSON DUNN**

Hon. Edgardo Ramos  
U.S. District Judge

July 9, 2024  
Page 3

added). As *every* securities publication then in existence provided, a "dealer sells to and buys from a client." Charles F. Hodges, *Wall Street* 361 (1930); *cf. Donander Co. v. Comm'r*, 29 B.T.A. 312, 315 (1933) ("dealer" is "a merchant who holds himself out to sell to customers").

Against this backdrop, it would take extraordinary evidence to believe that Congress intended "dealer" to take on a meaning at war with its ordinary and traditional sense—to sweep in every business that regularly buys and sells securities, even if, like Power Up Lending, it is "not provid[ing] advice or services to other investors, but is instead acting in its own best interests as an investor" or lender. *Chapel Invs. v. Cherubim Interests, Inc.*, 177 F. Supp. 3d 981, 991 (N.D. Tex. 2016) (such a person "cannot be considered a dealer"). The SEC has no such evidence. To be sure, the agency has convinced a few courts recently to adopt a definition of "dealer" that would sweep in every investment company, *e.g.*, *SEC v. Morningview Fin. LLC*, 2023 WL 7326125, at *13 (S.D.N.Y. Nov. 7, 2023), but, respectfully, those decisions do not reflect a realistic assessment of the language Congress adopted in 1934. That language—the SEC itself said at the time—is limited to one who buys and sells securities to customers. *See SEC Report on the Feasibility and Advisability of the Complete Segregation of the Functions of Dealer and Broker*, at XIV (1936). And, tellingly, in the ninety years between 1934 and 2023, every appellate and adjudicated SEC decision to construe the term has arisen in that context. *See Roth v. SEC*, 22 F.3d 1108, 1110 (D.C. Cir. 1994); *SEC v. Ridenour*, 913 F.2d 515, 516 (8th Cir. 1990); *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 361 (5th Cir. 1968); *Gordon Wesley Sodorff, Jr.*, 1992 WL 224082, at *5 & n.27 (SEC Sept. 2, 1992). As the SEC's own briefs put it, a broker-dealer "assist[s] [its] clients to buy and sell securities," SEC Br. 7, *Roth* (No. 92-1557), 1993 WL 13650741; the "criteria" that "define[s] a dealer" is "regularly engag[ing] in transactions directly with the customers," SEC Br. 33 n.37, *Ridenour* (No. 89-2534). As the Second Circuit recently explained, a broker-dealer "effect[s] securities transactions for customers." *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 248 (2d Cir. 2020). Power Up Lending does none of that.

II. **The Retroactive Application of the SEC's New "Dealer" Theory Violates Fundamental Principles of Fair Notice.**

Even if the SEC's theory *were* permissible as a matter of statutory interpretation, fundamental principles of fair notice would still require dismissal. Agency guidance explicitly provides that convertible lenders—firms that "frequently buy convertible debt securities"—operate "without being broker-dealers." *Acqua Wellington*, 2001 WL 1230266, at *5 n.10. "When a government agency officially and expressly tells you that you are legally allowed to do something, but later tells you 'just kidding' and enforces the law retroactively against you and sanctions you for actions you took in reliance on the government's assurances, that amounts to a serious due process violation." *PHH Corp. v. CFPB*, 839 F.3d 1, 48 (D.C. Cir. 2016), *reinstated on reh'g en banc*, 881 F.3d 75 (D.C. Cir. 2018). That is especially true here, where the industry has engaged in the challenged conduct for "years," yet the SEC never took any "steps to advise the public that it believed the practice was questionable." *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996).

**GIBSON DUNN**

Hon. Edgardo Ramos  
U.S. District Judge

July 9, 2024  
Page 4

Respectfully submitted,

*/s/ Marshall R. King*

Marshall R. King


cc:     All counsel of record (via ECF)