**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

v.

**CURT KRAMER,**
**POWER UP LENDING GROUP, LTD.,**
**GENEVA ROTH REMARK HOLDINGS, INC.,**
**and 1800 DIAGONAL LENDING, LLC,**

**Defendants.**

**Civil Action No.**
**24-cv-03498 (ER)**

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

Suzanne J. Romajas
Daniel T. Lloyd
Stephen LeBlanc
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Dated: September 27, 2024

*Counsel for Plaintiff*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

THE STATUTORY SCHEME ...................................................................................2

THE COMPLAINT'S ALLEGATIONS ....................................................................2

    I.     The Defendants' Business Model Was To Buy And Sell Securities ............................2

    II.    Defendants Bought And Sold Securities Daily..............................................................3

    III.   Defendants' Profits Were Principally Derived From The Purchase and Sale Of Securities During The Relevant Period............................................................................4

    IV.   Defendants Were Not Registered As Dealers ...............................................................4

ARGUMENT ..............................................................................................................5

    I.     The Fed. R. Civ. P. 12(b)(6) Standard ..........................................................................5

    II.    The Complaint States A Plausible Claim For Violations of Exchange  Act 15(a) ........5

        A.  The Pleading Standard ...................................................................................5

        B.  The Complaint Satisfies Every Element Of The Pleading Standard ..............6

        C.  Ample Caselaw Supports The Conclusion Defendants Were Dealers ...........7

        D.  Defendants Criticize These Cases As Flawed But Rely On Wholly Distinguishable Or Inapposite Cases...........................................................................9

    III.   The Statutory Definition Of "Dealer" Does Not Require Customers.........................10

        A.  Defendants Present No Valid Reason For Ignoring The Statutory Definition ...........10

        B.  Congress Did Not Silently Require Dealers To Have Customers ..............................12

        C.  The Legislative History Confirms That Congress Intended Dealers To Be Identified Based On Their Activity, Not On Whether They Had Customers ...........................14

        D.  Contemporaneous Sources Undermine Defendants' Interpretation .........................15

    IV.   The Complaint Alleges Defendants Had Customers ...................................................17

    V.    The Court Need Not Concern Itself With Hypothetical Enforcement Actions Against Hypothetical Market Participants ..................................................................................17

VI.    Defendants' Constitutional Arguments Lack Merit.......................................................18

A.  Defendants Had Fair Notice Of Their Registration Obligation ..................................18

B. Defendants' Assertions That They Were Misled About The Need To Register As Dealers Are Not Credible..............................................................................................20

C. The SEC Has Not Selectively Enforced Exchange Act Section 15(a) Against Defendants Or Microcap Convertible Lenders Generally ...........................................23

VII.    The Complaint's Demand For Relief Is Proper ...........................................................25

CONCLUSION..........................................................................................................................26

# TABLE OF AUTHORITIES

## Cases

Allaire Corp. v. Okumus,
    433 F.3d 248 (2d Cir. 2006)...........................................................................22

Ashcroft v. Iqbal,
    556 U.S. 662 (2009).........................................................................................5

Bond v. United States,
    572 U.S. 844 (2014)...................................................................................11, 12

Bostock v. Clayton Cnty.,
    590 U.S. 644 (2020).......................................................................................13

Chapel Invs. Inc. v. Cherubim Interests, Inc.,
    177 F. Supp. 3d 981 (N.D. Tex. 2016) .............................................................9

Christopher v. SmithKline Beecham Corp.,
    132 S. Ct. 2156 (2012)....................................................................................18

Digital Realty Tr., Inc. v. Somers,
    583 U.S. 149 (2018)...........................................................................10, 11, 14

Davis v. Metro N. Commuter R.R,
    No. 23-CV-1041, 2024 WL 1434284 (2d Cir. April 3, 2024)....................23, 24

Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,
    601 U.S. 42 (2024).........................................................................................10

Discover Growth Fund, L.L.C. v. Camber Energy, Inc.,
    602 F. Supp. 3d 982 (S.D. Tex. 2022) ..............................................................9

Eastside Church of Christ v. Nat'l Plan, Inc.,
    391 F.2d 357 (5th Cir. 1968) ...............................................................2, 9, 20

Friends of E. Hampton Airoport, Inc. v. Town of E. Hampton, Quicken Loans, Inc.
    566 U.S. 624 (2012).........................................................................................5

FTC v. Flotill Prods.,
    389 U.S. 179 (1967)........................................................................................25

FTC v. Wyndham Worldwide Corp.,
    799 F.3d 236 (3d Cir. 2015)...........................................................................18

Graham v. SEC,
    222 F.3d 994 (D.C. Cir. 2000) .......................................................................21

*Harlen Assocs. v. Inc. Vill. of Mineola*,
    273 F.3d 494 (2d Cir. 2001)...................................................................23

*Heckler v. Chaney*,
    470 U.S. 821 (1985).........................................................................21

*In re Immune Pharms. Inc.*,
    635 B.R. 118 (Bankr. D.N.J. 2021) .....................................................9

*In re Scripsamerica, Inc.*,
    634 B.R. 863 (Bankr. D. Del. 2021) ...................................................9

*Kokesh v. SEC*,
    137 S. Ct. 1635 (2017)......................................................................24

*Lamie v. U.S. Tr.*,
    540 U.S. 526 (2004).........................................................................13

*Landreth Timber Co. v. Landreth*,
    474 U.S. 681 (1985)...........................................................................7

*LeClair v. Saunders*,
    627 F.2d 606 (2d Cir. 1980)..............................................................24

*Lepper v. Scordino*,
    No. 22-1064, 2023 WL 4004220 (2d Cir. June 15, 2023)................24

*Oceana Capital Grp. Ltd. v. Red Giant Ent., Inc.*,
    150 F. Supp. 3d 1219 (D. Nev. 2015).................................................9

*Radzinskaia v. N.H.*,
    474 U.S. 681 (1985).....................................................................9, 10

*Roth v. SEC*,
    22 F.3d 1108 (D.C. Cir. 1994) ......................................................2, 11

*Sacket v. EPA*,
    598 U.S. 651 (2023).....................................................................11, 12

*SEC v. Almagarby*,
    92 F.4th 1306 (11th Cir. 2024) .............................................18, 19, 22

*SEC v. Auctus Fund Mgmt., L.L.C.*,
    No. 23-cv-11233, 2024 WL 3498593 (D. Mass. July 22, 2024) ...................8, 19

*SEC v. Carebourn Capital, LP*,
    No. 21-cv-2114, 2022 WL 1639515 (D. Minn. May 24, 2022) ...................8, 19

*SEC v. Contorinis,*
    743 F.3d 296 (2d Cir. 2014).............................................................................25

*SEC v. Culpepper,*
    270 F.2d 248 (2d Cir. 1959).............................................................................21

*SEC v. Fierro,*
    No. 20-02104, 2020 WL 7481773 (D.N.J. Dec. 18, 2020).........................6, 8, 12

*SEC v. Fife,*
    No. 20-cv-5527, 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021).........................6, 8

*SEC v. Genesis Glob. Cap., L.L.C.,*
    No. 23-cv-00287, 2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024).....................25

*SEC v. Keener,*
    No. 1:20-cv-21254, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020) ......... 5, 6, 8, 24

*SEC v. Keener,*
    102 F.4th 1328 (11th Cir. 2024) .................................................................6, 8, 24

*SEC v. Kik Interactive Inc.,*
    492 F. Supp. 3d 169 (S.D.N.Y. 2020)..............................................................19

*SEC v. LG Capital Funding, LLC,*
    702 F. Supp. 3d 61 (E.D.N.Y. Nov. 13, 2023) ...................................................8

*SEC v. Morningview Fin. L.L.C.,*
    No. 22 Civ. 8142, 2023 WL 7326125 (S.D.N.Y. Nov. 7, 2023) ..............*passim*

*SEC v. Pentagon Cap. Mgmt. PLC,*
    612 F. Supp. 2d 241 (S.D.N.Y. 2009)..............................................................19

*SEC v. Ridenour,*
    913 F.2d 515 (8th Cir. 1990) ..................................................................9,19, 20

*SEC v. River N. Equity L.L.C.,*
    415 F.Supp. 3d 853 (N.D. Ill. 2019) .........................................................6,8,12

*SEC v. Zandford,*
    535 U.S. 813 (2002)........................................................................................11

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001)..........................................................................................12

*United States v. Epskamp,*
    832 F.3d 154 (2d Cir. 2016).............................................................................12

*Upton v. SEC,*
    75 F.3d 92 (2d Cir. 1996) ................................................................................. 18

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ......................................................................................... 18

*XY Planning Network, L.L.C. v. SEC,*
    963 F.3d 244 (2d Cir. 2020) ............................................................................. 17

**Statutes**

15 U.S.C. § 78c ..................................................................................................... *passim*

15 U.S.C. § 78e ........................................................................................................ 13

15 U.S.C. § 78k ........................................................................................................ 13

15 U.S.C. § 78o ................................................................................................... 5, 20

15 U.S.C. § 78z ........................................................................................................ 21

**Rules**

17 C.F.R § 200.41 ................................................................................................... 25

17 C.F.R §240.15l .................................................................................................... 17

Fed. R. Evid. 201(b) .................................................................................................. 3

**Legislative Materials**

Fed. Sec. Exch. Act of 1934,
    S. 3420, 73d Cong. 4 (as reported, 2d Sess. 1934) ........................................ 15

Nat'l Sec. Exch. Act of 1934,
    S. 2693, 73d Cong. 5 (as introduced, 2d Sess. 1934) ..................................... 14

Nat'l Sec. Exch. Act of 1934,
    H.R. 9323, 73d Cong. 5 (as reported, 2d Sess. 1934) .................................... 15

*Stock Exch. Reg.: Hearing on H.R. 7852 & H.R. 8720 Before the H. Comm. on Interstate &*
*Foreign Commerce,*
    73d Cong. 154 (2d Sess. 1934) ....................................................................... 14

*Stock Exchange Practices: Hearings on S. Res. 84, S. Res. 56 & S. Res. 97 Before the S. Comm.*
*on Banking and Currency,*
    73d Cong. 6423, 6727 (2d Sess. 1934) ........................................................... 14

**Other Authority**

*Acqua Wellington N. Am. Equities Fund, Ltd.*,
    SEC No-Action Ltr. 2001 WL 1230266 (Oct. 11, 2011)...............................................21, 22

*In the Matter of Curt Kramer and Hope Cap., Inc.*,
    2016 WL 11471986 (Oct. 27, 2016) ...................................................................... 20

*In the Matter of Curt Kramer, Mazuma Corp., Mazuma Funding Corp., and Mazuma Holding Corp.*,
    2013 WL 6157152 (Nov. 25, 2013)...................................................................... 20

*SEC, Order Instituting Cease-and-Desist Proceedings*,
    No. 100769 (Aug. 19, 2024)
    https://www.sec.gov/files/litigation/admin/2024/34-100769.pdf,, ................................... 25

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this brief in opposition to Defendants' motion to dismiss. Dkts. 27, 28, 29. For the reasons that follow, Defendants' motion should be denied in its entirety.

## PRELIMINARY STATEMENT

The SEC's Complaint alleges in detail that Defendant Kurt Kramer ("Kramer") and his controlled entities Defendants Power Up Lending Group, Ltd. ("Power Up"), Geneva Roth Remark Holdings, Inc. ("Geneva Roth"), and 1800 Diagonal Lending, LLC ("1800 Diagonal") (collectively "Power Up Entities" and, with Kramer, "Defendants") were unregistered securities "dealers" operating in violation of Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"). 15 U.S.C. §78o(a)(1).

Specifically, from January 1, 2018 through at least March 31, 2023 (the "Relevant Period"), Defendants executed approximately 2,000 stock purchase agreements ("SPAs") with approximately 325 microcap issuers from which they purchased convertible notes and convertible preferred stock, which they converted into billions of newly issued shares of common stock, and then sold into the public markets, earning trading profits of more than $60 million. Defendants' conduct fell squarely within the Exchange Act's "dealer" definition, set forth in Exchange Act Section 3(a)(5), 15 U.S.C. § 78c(a)(5)(A), meaning that the Power Up Entities were required to register as dealers with the SEC and Kramer was required to register or associate with a registered dealer, 15 U.S.C. § 78o(a)(1), which they did not do.

Defendants concede that they regularly bought and sold securities for their own accounts and that they were not registered with the SEC. Nevertheless, they ask this Court to dismiss the SEC's Complaint because Defendants did not have "customers," even though Exchange Act's "dealer" definition never mentions that term.

As demonstrated below, Defendants' atextual reading of Exchange Act Section 3(a)(5)

1

provides no basis to dismiss the SEC's well-plead claims. (Points I-IV). Defendants' fair notice and equal protection arguments fare no better. Defendants had fair notice of Congress' long-standing and unambiguous definition of "dealer," and they cannot show disparate treatment in comparison to other similarly-situated businesses, nor that this case was motivated by malice or bad faith. (Point V). This Court should deny Defendants' motion for all these reasons.

## THE STATUTORY SCHEME

Exchange Act Section 15(a)'s registration requirement "serves as the keystone of the entire system of broker-dealer regulation." *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) (citation and quotation marks omitted). "It is through the registration requirement that some discipline may be exercised over those who may engage in the securities business and by which necessary standards may be established with respect to training, experience, and records." *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968).

## THE COMPLAINT'S ALLEGATIONS

## I.    The Defendants' Business Model Was To Buy And Sell Securities

Defendants' business model was to: (i) execute SPAs to purchase unregistered convertible notes and convertible preferred stock ("convertible securities") from microcap issuers; (ii) convert a portion of the outstanding note balance or a portion of the preferred shares into unrestricted newly issued shares of common stock after waiting out a regulatory holding period; (iii) sell the post-conversion shares into the public markets as quickly as the markets would bear; and then (iv) restart the conversion cycle until the balances were fully converted. Dkt. 1 (Compl.) ¶¶ 2, 27-36 (SPAs), 37 (notes), 38 (preferred stock), 39-40, 42 (conversions), 41 (court filings), 42-43 (sales and recycling), 73, 88, 102 (reason for prompt sales).

Defendants executed this business model in a variety of ways from their offices in New

York and Virginia. *Id.* ¶¶ 12-14. Defendants' employees cold-called, emailed, and met with and hosted events for, microcap issuers and their representatives. *Id.* ¶¶ 21-23. Issuers, or consultants and finders acting on their behalf, reached out to Defendants in search of financing. *Id.* ¶ 24. The business, to some degree, was self-generating as issuers became repeat customers. *Id.* ¶ 26. In their interactions, Defendants steered issuers to convertible securities transactions. *Id.* ¶ 25.

The transactional documents discouraged issuers from repaying the notes or recalling the preferred shares and expressly contemplated a disposition by conversion into shares: *First*, upon execution of an SPA, the issuer was required to reserve a sufficient number of shares to cover Defendants' future conversion, which prevented the issuer from selling those shares to anyone else. *Id.* ¶¶ 37, 38. *Second,* upon funding of an SPA, the clock was started on the regulatory holding period that Defendants needed to satisfy to freely sell post-conversion shares in the future. *Id.* ¶¶ 29-31, 33. *Third*, although the notes typically had a one-year term to maturity, they granted Defendants the unilateral right to convert after 180 days, meaning that Defendants could convert a note before the issuer became obligated to repay it. *Id.* ¶ 37. Defendants had the same unilateral right to convert preferred shares after 180 days. *Id.* ¶ 38. *Fourth*, the notes imposed steep financial penalties if the issuer repaid in cash before the 180th day. *Id.* ¶¶ 37, 38.

## II. Defendants Bought And Sold Securities Daily

In practice, averaging more than one to two SPAs per day,[1] Kramer executed more than 2,000 SPAs during the Relevant Period, pursuant to which the Power Up Entities purchased convertible securities from approximately 325 microcap issuers. *Id.* ¶¶ 3, 49, 51, 54. Defendants converted those securities, in multiple tranches, into more than 90 billion shares of newly issued

---

[1] The Court may take judicial notice that there are 1,298 business days (excluding weekends and holidays) during the period January 1, 2018 through March 31, 2023. *See* Fed. R. Evid. 201(b).

common stock. *Id.* ¶¶ 3, 42, 46, 49, 51, 54. Following each conversion, Defendants quickly deposited the shares into their brokerage accounts, from which Defendants sold shares on a daily or near daily basis until all shares from a conversion were sold, and the process was repeated. *Id.* ¶ 43.[2] The time it took to complete the sale of shares from a conversion varied, but was typically measured in single-digit days. *See, e.g., id.* ¶¶ 75 (4-day average for sale of Bantec shares), 83 (5-day average for sale of PCT shares), 104 (3-day average for sale of Neutra Corp. shares). For at least some of the issuers this was the way in which a large percentage of their common stock was distributed to the public. *Id.* ¶¶ 77, 92-93, 106.

### III.    Defendants' Profits Were Principally Derived From The Purchase And Sale of Securities During The Relevant Period

As of March 31, 2023, Defendants converted notes and preferred shares into more than 90 billion shares of newly issued common stock, which they sold into the public markets, generating gross sales proceeds of at least $120 million and net trading profits of at least $60 million. *Id.* ¶¶ 46-47, 49, 51, 54. Defendants continued to convert notes and preferred shares and generate profits after March 31, 2023. *Id.* ¶¶ 3, 47, 49, 51, 54.

Some issuers repaid their notes or redeemed their preferred shares, with penalties. But over 75% of Defendants' profits during the Relevant Period derived from the purchase and sale of securities. *Id.* ¶¶ 46, 49 (75% for Power Up), 51 (80% for Geneva), 54 (75% for 1800 Diagonal).

### IV.    Defendants Were Not Registered As Dealers

During the Relevant Period, continuing through the present, none of the Power Up Entities were registered as dealers with the SEC, and Kramer was neither registered as a securities dealer nor associated with a registered securities dealer. *Id.* ¶¶ 11-14.

---

[2] Kramer was the sole owner, and control person, of the Power Up Entities, and was involved in virtually every stage of operations. Dkt. 1 ¶¶ 4, 6, 12-14, 18, 27, 39, 49, 51, 54, 62, 71, 78, 83, 87, 95, 98, 100, 101.

# ARGUMENT

## I.    The Fed. R. Civ. P. 12(b)(6) Standard

A complaint survives a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) if it contains "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility "is not akin to a 'probability requirement" but requires more than a sheer possibility that defendant has acted unlawfully. *Id.* The SEC's Complaint more than meets this standard.

## II.    The Complaint States A Plausible Claim For Violations Of Exchange Act 15(a)

In interpreting any statute, courts begin with the plain language of the statute itself. *Friends of E. Hampton Airport, Inc., v. Town of E. Hampton*, 841 F.3d 133, 147 (2d Cir. 2016), *cert denied*, 581 U.S. 948 (2017) (citing *Marx v. Gen. Revenue Corp.,* 568 U.S. 371, 376 (2013)). Exchange Act Section 15(a) makes it "unlawful for any … dealer … to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce a purchase or sale of any security" unless the dealer is registered with the SEC. 15 U.S.C. § 78o(a)(1). A "dealer" is "any person engaged in the business of buying and selling securities … for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A). The definition contains a carve-out, commonly referred to as the "trader" exception, for any person who **"**buys or sells securities … for such person's own account, either individually or in a fiduciary capacity, but not as part of a regular business." 15 U.S.C. § 78c(a)(5)(B).

The Complaint more than plausibly alleges that Defendants were in the business of buying and selling securities, and that they were dealers, not traders, that violated Exchange Act Section 15(a), by failing to register or associate with a registered dealer.

### A.    The Pleading Standard

Contrary to Defendants' assertions, the SEC does not base its claims on a hyper-literal

interpretation of the statutory dealer definition, 15 U.S.C. § 78c(a)(5). Numerous courts, including the Southern District of New York in *SEC v. Morningview Fin. LLC*, No. 22 Civ. 8142, 2023 WL 7326125 (S.D.N.Y. Nov. 7, 2023), have addressed this same interpretive issue, considered identical or near-identical arguments to those advanced by Defendants here, and have developed standards for distinguishing between a dealer and a trader.

     *Morningview* is one of the more recent cases, and the most recent in this district. The Court "synthesized" its analysis of the statutory definition, the large body of caselaw from other jurisdictions, and historical and other evidence, and held that, "to sufficiently allege that a person or entity acted as a *prima facie* 'dealer' under the Exchange Act, a litigant must plead facts establishing that the person or entity, (1) bought and sold securities, (2) as principal rather than as agent for another, (3) as part of a profit-seeking enterprise, and (4) on more than a few isolated occasions." *Id. at* *11-13 (S.D.N.Y. Nov. 7, 2023) (citing cases from other jurisdictions).[3]

### B.    The Complaint Satisfies Every Element Of The Pleading Standard

     The SEC's Complaint satisfies every element of the standard set forth in *Morningview* and therefore plausibly establishes that each Defendant was a "dealer" within the meaning of the Exchange Act definition, 15 U.S.C. § 78c(a)(5).

     **Defendants Bought Securities on a Daily Basis.** Defendants executed SPAs with issuers on a daily basis and purchased convertible notes and preferred shares. Dkt. 1 ¶¶ 27-38, 46. The

---

[3] *Morningview*'s standard is consistent with courts outside this district, all of which have focused on (i) "the **regularity** of Defendants' participation in securities transactions and (ii) "the **level of participation**, whether measured by volume of trades or profit realized," to determine whether a Complaint plausibly alleges that the defendant acted as a securities dealer. *See, e.g., SEC v. Fife*, No. 20-cv-5527, 2021 WL 5998525, at *6 (N.D. Ill. Dec. 20, 2021) (citing *SEC v. River North Equity, LLC*, 415 F. Supp. 3d 853, 858, 859 (N.D. Ill. 2019); *SEC v. Keener*, No. 1:20-cv-21254, 2020 WL 4736205, at *4-5 (S.D. Fla. Aug. 14, 2020); *SEC v. Fierro*, No. 20-02104, 2020 WL 7481773, at *3 (D.N.J. Dec. 18, 2020)).

SPAs identified the notes and preferred shares as securities and also functioned as agreements to acquire common stock upon conversion. *Id.* ¶¶ 28-32, 37-38. Exchange Act Sections 3(a)(10) and 3(a)(13) expressly define a "security" to include any "note" with a maturity over nine months and "any contract to buy, purchase, or otherwise acquire." 15 U.S.C. §§ 78c(a)(10), 78c(a)(13).

**Defendants Sold Securities On A Daily Basis.** Defendants converted notes and preferred shares into billions of shares of common stock, which they sold into the public markets on daily basis. Dkt. 1 ¶¶ 39, 42-43; *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 693 (1985) (common stock is the "quintessence" of a security).

**Defendants Acted As Principle, Not Agent.** Defendants traded solely for the benefit of their own accounts and Kramer, their sole owner and sole source of funds other than the reinvestment of profits. Dkt. 1 ¶¶ 4, 16.

**Defendants Were Profit-Seeking Enterprises.** The Power Up Entities are profit-seeking enterprises. They have offices and employees. *Id.* ¶¶ 12-13, 19. They actively solicit business and much of it is from repeat customers, who they steer to convertible securities. *Id.* ¶¶ 4, 16, 20-26. And 75% of their profits came from the purchase and sale of securities. *Id.* ¶ 48.

**Defendants Bought and Sold Securities On More Than a Few Isolated Occasions.** The frequency and high volume of Defendants' securities transactions establish that they bought and sold securities on far more than a few isolated occasions. Indeed, they executed more than 2,000 SPAs with approximately 325 issuers, converted underlying notes and preferred shares into 90 million shares of common stock that were sold into the public markets, nearly daily following each conversion. Dkt. 1 ¶¶ 3, 42, 43, 46, 49, 51, 54.

C.     <u>**Ample Caselaw Supports The Conclusion That Defendants Were Dealers**</u>

Every court that has considered whether allegations of high-volume purchases and sales, like those alleged here, satisfy the pleading standard, has concluded such allegations plausibly

establish a defendant microcap convertible lender is engaged in the regular business of buying and

selling securities and is therefore a dealer. The decisions in this area include:

- *River North*, 415 F. Supp. 3d at 858 (denying motion to dismiss) (defendant bought and sold over 10 billion shares of stock from more than 62 microcap issuers, and then quickly resold them to the public for $31 million in profit);

- *Keener*, 2020 WL 4736205, at *4 (denying motion to dismiss) (defendant bought and converted over 100 convertible notes securities from more than 100 microcap issuers during 3-year period and sold into the public markets approximately 17.5 million shares of stock derived from the converted notes);

- *Fierro*, 2020 WL 7481773, at *4 (denying motion to dismiss) (defendants bought and converted over 50 notes from over 20 issuers and sold the shares into the public markets for profits of about $2.3 million);

- *Fife*, 2021 WL 5998525, at *1, 4-6 (denying motion to dismiss) (defendants purchased convertible notes from approximately 135 penny stock issuers over 5 years, netting approximately $61 million on the sale of post-conversion shares);

- *SEC v. Carebourn Cap., LP*, No. 21-cv-2114, 2022 WL 1639515, at *2, 4 (D. Minn. May 24, 2022) (denying motion to dismiss) (defendants purchased more than 100 convertible promissory notes from approximately 40 different penny stock issuers, converted those notes, and sold more than 17.5 billion newly issued shares into the public markets);

- *SEC v. LG Capital Funding, LLC*, 702 F. Supp. 3d 61, 65, 73, 77-79 (E.D.N.Y. Nov. 13, 2023) (denying motion to dismiss) (defendants purchased 330 convertible promissory notes from over 100 penny stock issuers, converted at least 150 of them, and sold more than 23 billion unrestricted, newly issued shares of commons stock); and

- *Morningview*, 2023 WL 7326125, at *2-3 (S.D.N.Y. Nov. 7, 2023) (denying motion to dismiss) (defendants purchased at least 68 convertible promissory notes and 4 warrants from 35 issuers, incrementally converted the notes and warrants in at least 213 conversion transactions, and sold more than 3 billion shares of common stock into the public markets, earning approximately $14.8 million in trading profits).

- *SEC v. Auctus Fund Mgmt., LLC*, 23-cv-11233, 2024 WL 3498593, at *5 (D. Mass. July 22, 2024) (holding dealer definition was unambiguous and denying motion to dismiss) (defendants executed more than 100 SPAs in return for notes, converted the notes to obtain more than 60 billion shares of common stock, sold more than 60 billion shares into the market, generating more than $100 million in profits).

The SEC's Complaint unquestionably pleads that Defendants were in the regular business of

buying and selling securities. The frequency and high volume of their securities transactions put

them well over the line of a non-dealer.[4]

### D.    Defendants Criticize These Cases As Flawed But Rely On Wholly Distinguishable Or Inapposite Cases

Defendants label the above-cited cases as "deeply flawed" and state that they do not bind this Court. But then they label as "precedent" other cases from outside of this district that are either wholly inapposite or wholly distinguishable. Dkt. 28 at 13-14.[5]

The bulk of these cases are discussed in more detail below,[6] but the SEC highlights *Radzinskaia v. NH Mt., LP*, No. 23-cv-21967, 2023 WL 6376457 (S.D. Fla. Sept. 29, 2023), as an example of Defendants' loose citation to what they claim are recent "precedent" from outside this district. *See* Dkt. 28 at 7. In that case, an EB-5 investor sought to void their limited partnership

---

[4] The Complaint's detailed allegations about Defendants' business – including that the conversion rates were discounted, that Defendants met issuers in person to drum up business, or that the notes required issuers to reserve and issue new shares that had not previously been part of the public float – do not turn this into a game of "Calvinball." Dkt. 28 at 19-20 (citing Dkt. 1 ¶¶ 2, 22-23). The Exchange Act requires an analysis of whether a defendant is regularly "engaged in the business of buying and selling securities," and the Complaint satisfies that requirement.

[5] Defendants principally cite cases decided in the context of fairness hearings held pursuant to Section 3(a)(10) of the Securities Act of 1933, in which courts were asked to approve settlements of creditor lawsuits against debtors, where the payment was to be made in securities. The courts held as part of those hearings that the settlements did not make the creditors dealers. Dkt. 28 at 7, 13 & n. 3. But, unlike here, in those cases, the courts did not have visibility into the creditor's business activities across all issuers and had to make an assessment based only on the limited transactions before them. *See Chapel Invs. Inc. v. Cherubim Interests, Inc.*, 177 F. Supp. 3d 981, 984-85, 990-91 (N.D. Tex. 2016) (fairness hearing on a proposed settlement between a creditor and debtor relating to one $100,000 note); *see also Discover Growth Fund, LLC v. Camber Energy, Inc.*, 602 F. Supp. 3d 982 (S.D. Tex. 2022) (fairness hearing on a proposed settlement between preferred stockholder and issuer); *Discover Growth Fund, LLC v. Beyond Com., Inc.*, 561 F. Supp. 3d 1034 (D. Nev. 2021) (similar); *In re Immune Pharm. Inc.*, 635 B.R. 118 (Bankr. D.N.J. 2021) (similar); *In re Scripsamerica, Inc.*, 863 (Bankr. D. Del. 2021) (similar); *Oceana Cap. Grp. Ltd. v. Red Giant Ent., Inc.*, 150 F. Supp. 3d 1219 (D. Nev. 2015) (similar) .

[6] Defendants also rely on *SEC v. Ridenour*, 913 F.2d 515 (1990) and *Eastside Church of Christ v. Nat'l Plan, Inc.*, 2391 F.2d 357 (5th Cir. 1968). Dkt. 28 at 13. The SEC addresses both cases in Point V.A. and demonstrates that Defendants' summaries are misleading. Both courts focused on the defendant's activity and *Eastside Church* was unmoved by defendants' customer arguments.

interest in a ski resort, on grounds that the defendants were unregistered securities dealers. The court found that the defendants were real estate developers only incidentally engaged in occasional securities transactions. *Radzinskaia*, 2023 WL 6376457, at *4-5 (agreeing with defendants that they did not buy or sell securities beyond a few isolated transactions and were not dealers).

III.    **The Statutory Definition Of "Dealer" Does Not Require Customers**

Defendants ask this Court to ignore the statutory definition and instead to search for the "original meaning" of "dealer" in 1934 when the Exchange Act was enacted, which they contend was customer-centric. Dkt. 28 at 6-7 (arguing that, in 1934, dealers purchased securities "from customers," sold securities "to customers," or effectuated securities transactions "for customers"), 7-17 (citing historical cases and treatises). Defendants arguments violate normal principles of statutory construction. Congress did not contemplate that a dealer ***must*** have customers.

"When Congress takes the trouble to define the terms it uses, a court must respect its definitions as virtually conclusive." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 59 (2024) (unanimous opinion). Courts may "not deviate from an express statutory definition merely because it varies from [the] term's ordinary meaning." *Id.* (citing *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160, 163-64 (2018)).

The Exchange Act's Section 3(a)(5) dealer definition is clear and unambiguous. The distinguishing factor between a dealer and a non-dealer is whether one is in the "**regular business**" of buying and selling securities for one's own account, not whether one buys from, sells to, or effectuates orders for customers. 15 U.S.C. § 78c(a)(5)(A), (B).

A.    **Defendants Present No Valid Reason
For Ignoring The Statutory Definition**

Defendants do not cite a single case that supports their argument that the statutory dealer definition should be ignored in favor of discerning "original meaning" from historical references.

Their citations to recent Supreme Court precedent are inapposite.

For example, in *Sackett v. EPA*, 598 U.S. 651, 658-59, 671 (2023) (Dkt. 28 at 8, 17, 20), the Court looked beyond the statutory definition of "navigable waters" because decades of litigation, including three Supreme Court cases, demonstrated it was unclear. Even then, the Court did not default to "original meaning." *Id.* at 674-75. Instead, the Court searched for a meaning of "navigable waters" that produced a substantive effect compatible with the purpose of the statute. *Id.* at 676-77. In *Bond v. United States*, 572 U.S. 844 (2014) (Dkt. 28 at 8, 18), the Court was concerned that a literal reading of the term "chemical weapons" could upset the Constitution's "balance between national and local power" by turning a purely local crime into a federal crime, despite no indication that Congress intended such a result. *Id.* at 858-59.[7]

These cases are consistent with the principle that a court may "deviate from a statutory definition only when applying the definition would be ***incompatible*** with Congress['] regulatory scheme or would destro[y] one of the statute's major purposes." *Kirtz*, 601 U.S. at 59 (citing *Digital Realty*, 583 U.S. at 160, 163-64 (emphasis added). But that principal does not support Defendants' arguments because the constitutional and federalism concerns expressed in those cases are not present here. Also, the Exchange Act is remedial and its terms must be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (quoting *SEC v. Capital Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 195 (1963)). Indeed, as the D.C. Circuit in *Roth v. SEC*, 22 F.3d 1108 (D.C. Cir. 1994), recognized, the registration requirement "serves as the keystone of the entire system of broker-dealer regulation." *Id.* at 1109. The definition is broad because of its utmost importance in effecting

---

[7] *Bond* was a "curious case" in which it was appropriate to "insist on a clear indication that Congress meant to reach purely local crimes, before interpreting the statute's expensive language in a way that intrudes on the police power of the States." 572 U.S. at 860.

the purposes of the [Exchange] Act." *Fierro*, 2020 WL 7481773, at *3 (quoting *River North*, 415 F. Supp. 3d at 858)). Here, unlike in *Sackett* and *Bond*, there is no basis for the Court to depart from the textual definition of "dealer" in Exchange Act Section 3(a)(5).

### B.    Congress Did Not Silently Require Dealers To Have Customers

It is clear from the statutory dealer definition itself and surrounding provisions within the Exchange Act that, when Congress drafted the Exchange Act dealer definition, it did not silently assume dealers have customers. *United States v. Epskamp*, 832 F.3d 154, 162 (2d Cir. 2016) ("[a] particular statute's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute").

First, if, as Defendants contend (Dkt. 28, *passim*), there is an unwritten statutory assumption that a "dealer" must effectuate transactions for customers, then Congress did not need to add 15 U.S.C. § 78c(a)(5)(B), the so-called trader exemption, which adjoins the dealer definition, 15 U.S.C. § 78c(a)(5)(A)). Traders do not have customers. Traders would automatically have been excluded from the "dealer" definition if having customers was a prerequisite for being a dealer. [8] *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (courts should not lightly assume that any of the statutory terms Congress has chosen are superfluous or void of significance).

Second, "when Congress wanted to refer to a customer, it simply used the word 'customer' rather than speaking in code," as evidenced by the fact that "customer" appears throughout the original Exchange Act. *Morningview,* 2023 WL 7326125, at *7 (citing *Caraco Pharm Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 416 (2022)). For example, as originally drafted and as exists today, Exchange Act 11(d) provides, in pertinent part:

It shall be unlawful for a member of a national securities exchange who is both a

---

[8] Congress also did not need to separately define dealers and brokers, since a "broker" is "any person engaged in the business of effecting transactions in securities for the account of others," 15 U.S.C. §78c(a)(4) (defining "broker").

> dealer and a broker ... to effect … any transaction with respect to any security (other than an exempted security) unless, ***if the transaction is with a customer***, he discloses to such customer in writing at or before the completion of the transaction whether he is acting as a dealer for his own account, as a broker for such customer, or as a broker for some other person.

Original Act § 11(d), 48 Stat. 892 (1934 (codified at 15 U.S.C. § 78k(d)) (emphasis added).[9] If the Exchange Act's dealer definition presupposes that a dealer has a relationship with a customer, Congress had no need to add the phrase "if the transaction is with a customer." *Morningview*, 2023 WL 7326125, at *7.[10]

Declining to read the word "customer" into the Exchange Act's clear dealer definition is also consistent with longstanding cannons of statutory interpretation, which caution courts against reading absent words into a statute when there is "a plain, nonabsurd meaning in view." *Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004) (noting the "difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted") (citing *Mobil Oil Corp. v. Higginbotham*, 436 U. S. 618, 625 (1978)); *see also Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020) ("This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job it as an end.").

---

[9] *Available at* https://heinonline.org/HOL/P?h=hein.leghis/lhsv0004&i=40

[10] Defendants' argument (Dkt. 28 at 10-11) that dealers, like brokers, must have customers because they are "in relationship with one another" and "keep quite close company," fails because Defendants are incorrectly applying the interpretive cannon of *noscitur a sociis*, which does not apply here. "Broker" and "dealer" are not undefined terms that Congress grouped together in the Exchange Act. To the contrary, Congress defined the terms separately, 15 U.S.C. §§ 78c(a)(4) ("broker") and 78c(a)(5) ("dealer"), and therefore the Court need not guess at their meaning based on the company they keep. If Defendants' argument were correct, then the words "exchange" and "member" would also have to be interpreted the same way as "broker" and "dealer," because all four terms often appear in lists together. *See, e.g.*, 15 U.S.C. §§ 78e (broker, dealer, exchange); 78g(c)(1) and (2) (national exchange, broker, dealer), 78h (broker, dealer, national exchange), 78l(a) (member, broker, dealer), 78n (member of a national securities exchange, broker, dealer). Such a result would be nonsensical, particularly where the terms are defined.

### C.    The Legislative History Confirms
###       That Congress Intended Dealers To Be Identified
###       <u>Based On Their Activity, Not On Whether They Had Customers</u>

At bottom, the language of Exchange Act dealer definition is clear, and there is no reason

for this Court to look beyond the plain meaning of the statutory definition and the surrounding

language of the statute, or to ignore *Morningview* or the cases from other districts. But a court may

consult legislative history to reinforce or confirm its understanding of clear legislative text. *Digital*

*Realty*, 583 U.S. at 171. Here the legislative history leads to the inescapable conclusion that

Congress intended a broad definition that focused on the regularity of securities transactions, not

whether a dealer effects transactions for customers.

In February 1934, the Exchange Act was introduced as part of a larger overhaul of the

financial markets. The original draft contained the following proposed definition of "dealer": "**The**

**term 'dealer' means any person engaged in a business of buying and selling securities for his**

**own account, through a broker or otherwise**." Nat'l Sec. Exch. Act of 1934, S. 2693, 73d Cong.

5 (as introduced, 2d Sess. Feb. 9, 1934) (§3.5 ("dealer"))).[11] In subsequent hearings, concerns were

raised that the words "engaged in a business of buying and selling securities," without more, could

be interpreted more broadly than intended.[12] In response, Congress narrowed the proposed

---

[11] *Available at* https://heinonline.org/HOL/P?h=hein.leghis/lhsv0011&i=33.

[12] *See, e.g.*, *Stock Exchange Regulation.: Hearing on H.R. 7852 & H.R. 8720 Before the H. Comm. on Interstate & Foreign Commerce*, 73d Cong. 154 (2d Sess. 1934) (Feb. 22, 1934 exchange between Rep. Mapes and President of the New York Stock exchange, who expressed concern that the words "engaged in the business" of buying and selling securities could capture individual investors who purchased and sold securities for personal investment, unless it was made clear that the definition only applies to those "primarily" engaged in the business of buying and selling securities) (a*vailable at* https://heinonline.org/HOL/P?h=hein.cbhear/serhifc0001&i=158); *Stock Exchange Practices: Hearings on S. Res. 84, S. Res. 56 & S. Res. 97 Before the S. Comm. on Banking and Currency*, 73d Cong. 6423, 6727 (2d Sess. 1934) (Mar. 1, 1934 exchange between Senator Kean and the President of the New York Stock Exchange using a hypothetical of a retired person who bought 100 shares of stock one day, and sold 100 shares the next, noting the risk that

"dealer" definition by adding the concept of "regularity" that now appears in 15 U.S.C. §78c(a)(5)(B), as in, a dealer is one who buys and sells securities for its own account as part of a regular business. The proposed definition was amended as follows:

> The term "dealer" means any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise, but does not include a bank, or any person insofar as he buys or sells securities for his own account, either individually or in some fiduciary capacity, but not as a part of a **regular business**.

Nat'l Sec. Exch. Act of 1934, H.R. 9323, 73d Cong. 5 (as reported, 2d Sess. 1934) (emphasis added);[13] Fed. Sec. Exch. Act of 1934, S. 3420, 73d Cong. 4 (as reported, 2d Sess. 1934) (emphasis added).[14] On June 6, 1934, the Exchange Act was enacted, with this exact dealer definition. Securities Exchange Act of 1934, H.R. 9323, 73d Cong., 48 Stat. 881 (2d Sess. 1934). And it remains in substantially the same form today.

### D.    Contemporaneous Sources Undermine Defendants' Interpretation

Defendants' citations to historical cases and reference materials do not support their position that, in 1934, "dealers" were generally understood to have customers. Indeed, in large part, these historical sources undermine Defendants' position.

Many of Defendants' cases arose under the Revenue Act of 1928, which, unlike Exchange Act Section 3(a)(5), expressly defined "dealer in securities" as "one who, as a merchant buys and sells securities to customers."[15] The *Morningview* court analyzed the same cases and concluded

---

such a person might be termed a "dealer," but also noting that a revision was underway to address that concern) (a*vailable at* https://heinonline.org/HOL/P?h=hein.cbhear/skexpct0001&i=9 and https://heinonline.org/HOL/P?h=hein.cbhear/skexpct0001&i=313).

[13] *Available at* https://heinonline.org/HOL/P?h=hein.leghis/lhsv0010&i=279

[14] *Available at* https://heinonline.org/HOL/P?h=hein.leghis/lhsv0011&i=142

[15] Dkt. 28 at 6-7, 17 (citing *Schafer v. Helvering*, 299 U.S. 171, 174 (1936) ("'The meaning of 'dealer in securities,' *as defined in the controlling [tax] regulation*…. is limited to one who, as a

that, "[f]ar from helping Defendants, those cases suggest that the drafters of the applicable tax regulations wanted the term 'dealer' to apply only to people selling to customers but did not think such application would have been self-evident without a definition of the term expressly including the word 'customers.'" *Morningview*, 2023 WL 7326125, at *9 (analyzing same cases).

Similarly, in C.F. Hodges, *Wall Street* 361 (1930), one of the cherry-picked treatises Defendants rely on (Dkt. 28 at 7-9), the author acknowledges that "dealer" includes not just persons who buy and sell from customers, but also "the odd-lot brokers on the floor of the Exchange, who trade only with fellow members, houses of issue which sell their own underwritings to the investing public and the great number dealing in unlisted securities." Dkt. 29-1; Dkt. 28 at 7. This treatise establishes that, back in the 1930s, not all dealers had customers.

Additionally, in 1934, shortly after the Exchange Act was signed into law, Charles H. Meyer, the author of a prominent treatise, noted that "[a] question arises whether a trader who has no customer but merely trades for his own account through a broker is a "dealer" under the Act." He concluded that "[a] fair interpretation of the Act would seem to indicate that if the operations of a trader are sufficiently extensive to be regarded as a regular business, he would be considered a 'dealer.'" Declaration of Stephen LeBlanc dated September 27, 2024, Ex. A (Charles H. Meyer, *The Securities Exchange Act of 1934: Analyzed and Explained*, 34 (July 1934)) at 33-34 (noting this definition could capture "professional traders"). Defendants preemptively attack this as a mere "possible interpretation," Dkt. 28 at 21; but their excerpt of Meyer's treatise (Dkt. 29-10), omitted an earlier page in which Meyer wrote, "It is important to bear in mind that the statutory definition

---

merchant, buys and sells securities to customers for the profit thereon.'") (emphasis added); 8, 9 (citing *Donander Co. v. Comm'r of Internal Revenue*, 29 B.T.A. 312, 313-14 (1933) (same)); 8 (citing *Harriman Nat'l Bank v. Comm'r of Internal Revenue*, 43 F.2d 950, 951-52 (2d Cir. 1930) (same)).

is not in all cases in exact accord with the commonly accepted meaning." LeBlanc Decl. Ex. A at 32.[16] The *Morningview* court considered this treatise and concluded that Meyer's commentary is evidence that, in 1934, the statute meant what a straightforward reading of its broad language "engaged in the business of buying selling securities" suggests it means. 2023 WL 7326125, at *8.

In sum, the contemporaneous evidence of a "dealer" in 1934 does not support Defendants' argument that there was a singular common understanding that this Court should apply over the clear and unambiguous statutory definition.[17]

## IV.    The Complaint Alleges Defendants Had Customers

Even if Defendants were correct that dealers need customers, which they are not, this Court must still accept as true the Complaint's allegations that Defendants had customers for purposes of resolving Defendants' motion. Dkt. 1 ¶¶ 22, 26, 63, 79, 94.

## V.    The Court Need Not Concern Itself With Hypothetical
## Enforcement Actions Against Hypothetical Market Participants

The Court should ignore Defendants' attempt to distract with hypothetical businesses, as none are presently before this Court. *See, e.g.*, Dkt. 28 at 2, 14-16, 17-18 (complaining that "every hedge fund, investment company, family office, and high-frequency trader in the world" could

---

[16] Defendants ignore the contemporaneous version of Black's Law Dictionary, which defined a "dealer" as "one who buys to sell—not one who buys to keep, or makes to sell." LeBlanc Decl. Ex. B. (Dealer, BLACK'S LAW DICTIONARY (3d ed. 1933)). "Customer" is not part of the definition.

[17] Nor are any of the more present-day cases cited by Defendants on this score more persuasive. For example, the Second Circuit's decision in *XY Planning Network, LLC v. SEC*, 963 F.3d 244 (2d Cir. 2020), concerned Regulation Best Interest and whether it was within the SEC's rule-making authority, which is not an issue here. Dkt. 28 at 7, 11. The rule established a standard of care for brokers, dealers and associated persons who make recommendations to retail customers, and it prohibited them from putting their own financial interest ahead of the retail customer. 17 C.F.R. § 240.15*l*-1. Neither the SEC's rulemaking, nor the Second Circuit's decision, reflected an understanding that a "dealer" ***must*** effect transactions for customers. *XY Planning*, 963 F.3d at 248 & n.2 (noting that brokers, dealers, and investment advisors "play distinct roles" but the boundaries have blurred since the early 1990s).

allegedly meet the dealer definition). The recitation of hypothetical cases does not warrant the dismissal of a well-pled complaint. *SEC v. Almagarby*, 92 F.4th 1306, 1318 (11th Cir. 2024) ("Our holding that Almagarby operated as an unregistered "dealer" in violation of the Exchange Act is based on his specific conduct" and "we do not mean to suggest that *every* professional investor who buys and sell securities in high volumes is a dealer.").[18]

## VI.    Defendants' Constitutional Arguments Lack Merit

Defendants also assert that, even if the SEC has stated a claim for violations of Exchange Act Section 15(a), this Court should bar those claims based on principals of due process and equal protection. Dkt. 28 at 23-24. Their arguments are meritless.

### A.    Defendants Had Fair Notice Of Their Registration Obligation

Defendants contend that they did not have fair notice of the SEC's position that Defendants were required to register as dealers. Dkt. 28 at 24. But the SEC's claims are based on a statute – Exchange Act Sections 3(a)(5) and 15(a)(1), 15 U.S.C. §§ 78c(a)(5), 78o(a)(1) – not an SEC-promulgated rule or regulation. "The relevant question is not whether [Defendants] had fair notice of the [agency's] interpretation of the statute, but whether [Defendants] had fair notice of what the statute itself requires." *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 253-54 (3d Cir. 2015).[19]

---

[18] Defendants' citation to *West Virginia v. EPA* is unavailing. Dkt. 28 at 15. That case dealt with an agency's issuance of a rule interpreting its grant of authority from Congress. 597 U.S. 697, 706 (2022). Here, by contrast, the SEC seeks to enforce a statute drafted by Congress, not an SEC rule. No "major questions" are being raised here. *Id.*at 716.

[19] Defendants' cases (Dkt. 28 at 24) are distinguishable as they concern an agency's interpretation of its own rules and were in a different procedural posture. *See Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (vacating post-hearing administrative censure order because SEC-drafted Rule 15c3-3(d) reflected substantial change in policy that the SEC had not reasonably communicated to the public). Indeed, some of the cases Defendants rely on do not even raise due process issues. *See, e.g., Christopher v. SmithKline Beecham Corp.*, 132 S.Ct. 2156, 2167-69 (2012) (affirming summary judgment, and declining to give *Auer* deference to DOL's changed interpretation of its own regulation because defendants' conduct occurred before DOL changed its interpretation).

The SEC was not required to develop guidance and/or warn microcap convertible lenders that the Exchange Act's registration provisions applied to them. *See SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 183 (S.D.N.Y. 2020) ("The law does not require the government to reach out and warn all potential violators on an individual or industry level.") (citing *Dickerson v. Napolitano*, 604 F.3d 732, 745-46 (2d Cir. 2010)). "Due Process requires only that the laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *SEC v. Pentagon Cap. Mgmt. PLC*, 612 F. Supp. 2d 241, 266-67 (S.D.N.Y. 2009) (citing *Valicenti Advisory Servs., Inc. v. SEC*, 198 F.3d 62 (2d Cir. 1999)).

The key terms of the Exchange Act's dealer definition – "person," "engaged in the business of buying and selling securities," "own account," "through a broker or otherwise" 15 U.S.C. § 78c(a)(5)(A) – are standard terms that provide a person of ordinary intelligence fair notice that they may be a dealer and therefore must register. Every court in this line of SEC cases against unregistered microcap convertible lenders has rejected defendants' due process arguments at the motion to dismiss stage, and beyond. *See, e.g., Morningview,* 2023 WL 7326125, at *13 (plain language of the statute gave fair notice of what the statute requires) (citing cases); *Auctus*, 2024 WL 3498593, at *5-7; *Carebourn Capital*, 2022 WL 1639515, at*6-7 (citing cases); *see also Almagarby*, 92 F.4th at 1319 (summary judgment).

Further, Defendants had fair notice of the requirements because several courts' interpretations of the statutory dealer definition **predate the relevant conduct** in this case, and found the defendants to be dealers based on their activity, not on whether they had customers. *See, e.g., SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) ("Ridenour's **level of activity during this period made him more than an active investor** .... We find no error in the court's conclusion that Ridenour was a broker-dealer, and that his failure to register as such violated section 15(a)(1) of

the Securities Exchange Act, 15 U.S.C. § 78o(a)(1)");[20] *Eastside Church of Christ v. Nat'l Plan, Inc.,* 391 F.2d 357, 361-62 (5th Cir. 1968) ("[t]he evidence demands a finding that National was so engaged [as a dealer]. National purchased many church bonds prior to the ones in question for its own account **as a part of its regular business** and sold some of them") (emphasis added).[21]

For all of the foregoing reasons, Defendants had fair notice that their activities required them to register as dealers.

### B.    Defendants' Assertions That They Were Misled About The Need To Register As Dealers Are Not Credible

To the extent that Defendants suggest they were misled by interactions with the SEC during prior investigations (Dkt. 28 at 5-6, 10, 14-15), their assertions are baseless. First, the prior enforcement actions bear no resemblance to this. Those cases involved findings that Kramer and entities he controlled purchased unregistered securities from one or two issuers and sold them in violation of Sections 5(a) and 5(c) of the Securities Act of 1933.[22] Dkt. 1 ¶ 11 & n.1. Neither of those matters overlapped in time with the activity at issue here and neither concerned:

- The Kramer-controlled entities named as Defendants in this lawsuit;
- Transactions in convertible securities;
- Thousands of securities transactions with hundreds of issuers; or

---

[20] The Eighth Circuit did not decide the *Ridenour* case "in the context of customer-order facilitation," as Defendants contend (Dkt. 28 at 13), but instead employed an activity-centered analysis to determine if the defendant was in the business of buying and selling securities. *Ridenour*, 913 F.3d at 517.

[21] Defendants characterize *Eastside Church* as involving sales to customers (Dkt. 28 at 13), but the Fifth Circuit rejected as "not applicable under the facts" a claim that the defendants had violated a rule requiring them to send written confirmations as if the churches were "customers." 391 F.2d at 363.

[22] *See In the Matter of Curt Kramer and Hope Cap., Inc.*, 2016 WL 11471986 (Oct. 27, 2016); *In the Matter of Curt Kramer, Mazuma Corp., Mazuma Funding Corp., and Mazuma Holding Corp.*, 2013 WL 6157152 (Nov. 25, 2013). There is no relationship between Securities Act Section 5, which requires registration of securities transactions, and Exchange Act Section 15, which requires registration as a broker or dealer with the SEC. *Compare* 15 U.S.C. § 77e *with* 15 U.S.C. § 78o.

- Violations of Exchange Act Section 15(a).

Defendants' effort to blame the SEC's Division of Corporation Finance ("Corp Fin") for failing to "even suggest[] that Kramer (or one of his businesses) was a dealer," Dkt. 28 at 5-6, 14-15,[23] fail as well. Such arguments are legally invalid. Exchange Act Section 26 specifically precludes the *absence* of SEC action from being deemed a position or approval by the SEC. It provides, in relevant part, that:

> No action or failure to act by the [SEC] … in the administration of this title shall be construed to mean that the [SEC] has in any way passed upon the merits of, or given approval to, any security or any transaction or transactions therein…

15 U.S.C. § 78z; *see also Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (an agency's decision to prosecute is "committed to an agency's absolute discretion").[24]

The Division of Trading and Market's[25] 2001 No-Action Letter, *Acqua Wellington N. Am Equities Fund, Ltd.*, SEC No-Action Ltr., 2001 WL 1230266 (Oct. 11, 2011), also does not support

---

[23] Defendants cite a 2007 speech by the then-Director of Corp Fin, which they mischaracterize as an announcement of an "Enforcement sweep." Dkt. 28 at 16 (citing White speech from Feb. 23, 2007). But the speech, which begins with the disclaimer that the statements reflect the speaker's views only, refers only to a "screening process" that Corp Fin's disclosure staff had put in place to identify "potentially problematic transactions" and "seek[] enhanced disclosure where appropriate." *Id.* (https://tinyurl.com/mr3xk7np at ¶ 8 (PIPES)). Defendants also cite a 2013 comment letter from Corp Fin to an issuer, which asks the issuer about its relationship with former Kramer businesses – not the Power Up Entities – and asks the issuer to enhance its disclosure about the relationship. Dkt. 28 at 5 (citing June 27, 2013 Ltr. to Pacific Gold, https://tinyurl.com/mtavrbm2).

[24] Relatedly, courts have held that "the SEC's failure to prosecute at an earlier stage does not estop the agency from proceeding once it has finally accumulated sufficient evidence to do so." *Graham v. SEC*, 222 F.3d 994, 1008 & n.26 (D.C. Cir. 2000) (citing 15 U.S.C. § 78z and other sources and stating that "what we have in this case is nothing more than a series of investigations into [defendant's] trades, which ultimately provided the SEC with sufficient understanding of the underlying scheme to file the complaint now before us"); *see also SEC v. Culpepper*, 270 F.2d 241, 248 (2d Cir. 1959) (mere silence is not "approval" and "neither the [SEC] nor its staff directly or indirectly caused the defendants to understand that it concurred in the legality of the [transaction]").

[25] Formerly known as the Division of Market Regulation.

Defendants' fair notice defense.[26] The *Acqua Wellington* no-action letter does not make a general assertion that "convertible lenders operate 'without being broker-dealers.'" Dkt. 28 at 1, 16, 23-24. The language that Defendants quote reflects **the requester's position**, as stated in their counsel's letter request. *Acqua Wellington*, 2001 WL 1230266, at *5 n.10, [https://tinyurl.com/wk7mbppz, at 5 n.10]. The SEC staff responded that:

> Based on the facts and representations set forth in your letter, and without necessarily agreeing with your analysis and conclusions, the staff will not recommend enforcement action to the Commission if Acqua Wellington, complying with the conditions in your letter, invests in equity lines of credit without registering with the Commission as a broker-dealer under Section 15 of the Exchange Act. This position is based solely upon the representations you have made and is limited strictly to the facts and compliance with the conditions described in your letter.

No reasonable person would read these words and think the SEC had expressed an official and broad-reaching view that microcap convertible note lenders are not dealers.[27] If the SEC's no-action letter process has relevance to this case, it is only because Defendants could have availed themselves of it and chose not to. *See Almagarby*, 92 F. 4th at 1319 (rejecting defendant's reliance on *Acqua Wellington* no-action letter as not "analogous to the specifics" of defendant's convertible

---

[26] No-action letters are not official statements of the SEC. They are issued by SEC staff in response to a request from a specific individual or entity who are unsure whether a particular action would violate the federal securities laws. *See*, SEC, No Action Letters, Investor.gov, https://tinyurl.com/yam42929 (last visited Sept. 25, 2024). If SEC staff grant the request for no action, the letter concludes that staff will not recommend that the SEC take enforcement action against the requester based on the facts and representations described in the request. *Id.* The positions taken by SEC staff in no-action letters are not precedential even as to the requester but may be instructive. *Allaire Corp. v. Okumus,* 433 F.3d 248, 254 (2d Cir. 2006).

[27] Additionally, and in response to the rhetorical question Defendants raise (Dkt. 28 at 19), the equity lines of credit described in the *Acqua Wellington* no-action letter worked nothing like Defendants' convertible securities. *Compare* Dkt. 1 ¶¶ 37-38 (Defendants have unilateral right to (1) convert notes before they reach maturity and (2) convert preferred securities during a period when redemptions are not allowed) *with Acqua Wellington,* 2001 WL 1230266, at *2-3, 6-7 (issuer decides whether and when to draw down on the equity line of credit, and thus whether and when to sell stock to Acqua Wellington, and agreed to numerous investor-protection safeguards, and to cap the price at which it resells the shares). Defendants are comparing apples and oranges.

note lending and explaining that defendant "could have applied for a letter of his own had he been concerned with compliance").

### C.    The SEC Has Not Selectively Enforced Exchange Act Section 15(a) Against Defendants Or Microcap Convertible Lenders Generally

Defendants next suggest that the SEC has violated their Equal Protection rights supposedly by (i) selectively enforcing Exchange Act Section 15(a) against Defendants specifically or microcap lenders generally, but not other businesses that Defendants perceive as similar, and (ii) adopting a rule that would regulate certain entities as dealers but allow them to register after a post-adoption period. Dkt. 28 at 1-2, 23. These arguments fail.

To establish that an agency has selectively prosecuted a party, the party must show that (i) compared to others similarly situated, he was selectively treated and (ii) the selective treatment was "motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Davis v. Metro N. Commuter R.R.*, No. 23-cv-1041, 2024 WL 1434284, at *3 (2d Cir. 2024) (citing *Hu v. City of N.Y.*, 927 F.3d 81, 91 (2d Cir. 2019) (citations omitted)). Defendants cannot (and will never be able to) meet that standard.[28]

First, as demonstrated (Point II.C.), the SEC filed and successfully litigated enforcement actions against numerous microcap convertible lenders for violations of Exchange Act Section 15(a), and asked courts to apply the same functional test in determining if a defendant is a dealer. Therefore, Defendants cannot demonstrate that they have been treated differently than entities

---

[28] If Defendants are claiming discrimination based on a "class of one" theory, their argument fails for similar reasons. *See Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ("class of one" claims require showing that claimant "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment").

which are the most similarly situated to them.

Second, though Defendants hypothesize that they have been treated differently than lenders like the one in *Aqua Wellington* that fund equity lines of credit, Dkt. 28 at 23, and "hedge funds" that trade convertible bonds (Dkt. 28 at 15-16), and the "significant liquidity providers" that were given a one-year grace period to register as dealers, Dkt 28 at 23, none of those groups bear a "reasonably close resemblance" to Defendants. *Davis*, 2024 WL 1434284, at *3 (citing *Hu*, 927 F.3d at 96); *see SEC v. Keener*, 102 F.4th 1328, 1335-26 (11th Cir. 2024) (rejecting same equal-protection argument as "meritless"). Further, Kramer's status as a two-time recidivist securities violator distinguishes him even among microcap convertible lenders.

Third, Defendants suggest no "malicious" or "bad faith" reason for this case. A party claiming selective enforcement must demonstrate they were singled out for reasons that so lack any reasonable nexus with a legitimate government policy that an improper purpose is all but certain. *Lepper v. Scordino*, No. 22-1064, 2023 WL 4004220, at *2 (2d Cir. June 15, 2023). But "Congress vested the [SEC] with broad authority to conduct investigations into possible violations of the federal securities laws," *Kokesh v. SEC*, 581 U.S. 455, 457 (2017), and granted the SEC wide latitude and discretion on when to investigate and when to bring enforcement actions, 15 U.S.C. §§ 78(d), 78u(a)(1). The SEC here is merely carrying out its mandate to enforce the securities laws against parties that have plainly violated the Exchange Act's registration requirements. If there are similarly-situated unregistered entities that the SEC has not pursued, the "failure to prosecute other offenders is not a basis for a finding of denial of equal protection." *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980) (the Constitution "does not require that all evils of the same genus be eradicated or none at all").

Finally, Defendants cite extensively to SEC Commissioner Mark T. Uyeda's August 24,

2024 dissenting statement issued in connection with a settled administrative proceeding involving microcap convertible lender GHS Investments and his February 6, 2024 dissenting statement issued in connection with a rulemaking giving "major liquidity providers" a grace period to register as dealers. Dkt. 28 at 1-2, 6, 17-20, 23 (GHS Dissent (Aug. 19, 2024), https://tinyurl.com/369f82hb; Definition Dissent (Feb. 6, 2024), https://tinyurl.com/mwpyys67). But nothing in either Dissent – which reflect his personal views, not the Commission's official views[29] – suggests "malice" or "bad faith" as a motivator for these actions. Defendants' Equal Protection claim is spurious and does not provide a basis for dismissal.

## VII.    The Complaint's Demand For Relief Is Proper

The SEC's Complaint makes a demand for relief, including for disgorgement, as required by Fed. R. Civ. P. 8(a). Dkt. 1 ("Relief Requested"). Defendants' attempt to dismiss the SEC's "claim for disgorgement" at this stage, (Dkt. 28 at 24-25), is premature. *SEC v. Genesis Global Cap., LLC*, No. 23-cv-00287, 2024 WL 1116877, at *16-17 (S.D.N.Y. Mar. 13, 2024) (Ramos, J.). Disgorgement is an equitable remedy to be decided after defendants' liability has been established, not a cause of action that must be plead in a complaint.[30]

---

[29]  The Commission is comprised of five Commissioners who take action by a vote of a majority of a quorum of Commissioners. 15 U.S.C. § 78d, 17 C.F.R. § 200.41; *FTC v. Flotill Prods., Inc.*, 489 U.S. 179, 183-84 (1967). Unanimity is not required to take official action. Comm'r Uyeda did not vote with the majority on these two issues. He issued the dissenting statements on which Defendants now rely, which are personal views. If anything, the majority decision in GHS to charge another microcap convertible lender with operating as an unregistered dealer in violation of Section 15(a) demonstrates that Defendants have not been selectively prosecuted. *See* SEC, Order Instituting Cease-and-Desist Proceedings, No. 100769 (Aug. 19, 2024), https://www.sec.gov/files/litigation/admin/2024/34-100769.pdf. Also, as mentioned, Defendants are not similarly-situated to the major liquidity providers that are the subject of the new rule.

[30] Defendants also misstate the disgorgement standard and improperly seek to import "but for causation" into the analysis. Dkt. 28 at 24-25. Disgorgement need only be a reasonable approximation of the profits causally connected to the violation; and the burden is on defendants to show the approximation is not reasonable. *SEC v. Contorinis*, 743 F.3d 296, 305 (2d Cir. 2014).

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

Dated:  September 27, 2024

Respectfully submitted,
Securities and Exchange Commission

*/s/Suzanne J. Romajas*

Suzanne J. Romajas
Daniel T. Lloyd (*pro hac vice*)
Stephen M. LeBlanc (*pro hac vice* pending)
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
202-551-4473 (Romajas)
202-551-3781 (Lloyd)
RomajasS@sec.gov
LloydD@sec.gov

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2024, I caused a true and correct copy of the foregoing SEC's Memorandum of Law in Opposition to Defendants' Motion to Dismiss to be served on all counsel of record via this Court's CM/ECF filing system.

 */s/Suzanne J. Romajas*

Suzanne J. Romajas
Counsel for Plaintiff