**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

        v.

CURT KRAMER,
POWER UP LENDING GROUP, LTD.,
GENEVA ROTH REMARK HOLDINGS, INC.
and 1800 DIAGONAL LENDING, LLC,

                Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 1:24-cv-03498-ER

Honorable Edgardo Ramos

ORAL ARGUMENT REQUESTED

**REPLY IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS</u>**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
    515 U.S. 687 (1995)..........................................................................................4, 5

*Bankamerica Corp. v. United States*,
    462 U.S. 122 (1983)..........................................................................................4

*Bond v. United States*,
    572 U.S. 844 (2014)..........................................................................................1, 4

*Borden v. United States*,
    593 U.S. 420 (2021)..........................................................................................5

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012)..........................................................................................4

*Donander v. Comm'r*,
    29 B.T.A. 312 (1933)........................................................................................6

*Dubin v. United States*,
    599 U.S. 110 (2023)..........................................................................................2

*Eastside Church of Christ v. National Plan, Inc.*,
    391 F.2d 357 (5th Cir. 1968) ...........................................................................9

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)..........................................................................................2

*Gupta v. SEC*,
    796 F. Supp. 2d 503 (S.D.N.Y. 2011)...........................................................10

*Harriman Nat'l Bank v. Comm'r*,
    43 F.2d 950 (2d Cir. 1930)...............................................................................6

*Indep. Cmty. Bankers of Am. v. Nat'l Credit Union Admin.*,
    2017 WL 346136 (E.D. Va. Jan. 24, 2017) ...................................................4

*Norris Bros. v. Commonwealth*,
    27 Pa. 494 (1856).............................................................................................6

*Oceana Capitol Grp. v. Red Giant Ent. Inc.*,
    150 F. Supp. 3d 1219 (D. Nev. 2015)..............................................................8

*Old Colony R. Co. v. Comm'r*,
    284 U.S. 552 (1932).........................................................................................6

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Radzinskaia v. NH Mountain, LP*,
    2023 WL 6376457 (S.D. Fla. Sept. 29, 2023) ...................................................................8

*Robinson v. Dep't of Educ.*,
    917 F.3d 799 (4th Cir. 2019) .............................................................................................5

*Saad v. SEC*,
    718 F.3d 904 (D.C. Cir. 2013) ...........................................................................................2

*SEC v. Berry*,
    2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) ................................................................10

*SEC v. Govil*,
    86 F.4th 89 (2d Cir. 2023) ...............................................................................................10

*SEC v. Ridenour*,
    913 F.2d 515 (8th Cir. 1990) ..........................................................................................8, 9

*STI Pharma, LLC v. Azar*,
    613 F. Supp. 3d 152 (D.D.C. 2020) ..................................................................................5

*U.S. Sugar Corp. v. EPA*,
    113 F.4th 984 (D.C. Cir. 2024) .........................................................................................4

*UARG v. EPA*,
    573 U.S. 302 (2014) ..........................................................................................................2

*United States v. Jackson*,
    58 F.4th 1331 (11th Cir. 2023) ..........................................................................................5

*United States v. Jones*,
    962 F.3d 1290 (11th Cir. 2020) .........................................................................................5

*United States v. Santos*,
    553 U.S. 507 (2008) ..........................................................................................................4

*Van Buren v. United States*,
    593 U.S. 374 (2021) ..........................................................................................................4

*Vill. of Willowbrook v. Olech*,
    528 U.S. 562 (2000) ........................................................................................................10

*Zellmer v. Meta Platforms, Inc.*,
    104 F.4th 1117 (9th Cir. 2024) ..........................................................................................4

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**Statutes**

15 U.S.C.
   § 78c ............................................................................................................... 7, 8
   § 78ff ................................................................................................................... 1
   § 78o ................................................................................................................... 1
   § 80a-3 ................................................................................................................ 5

**SEC Materials**

76 Fed. Reg. 46,960
   (SEC Aug. 3, 2011) ............................................................................................ 6

86 Fed. Reg. 5063
   (SEC Jan. 19, 2021) ........................................................................................... 3

# INTRODUCTION

Typically, when the Government stands accused of advocating a legal interpretation that would make millions of Americans criminals and render unlawful *trillions* of dollars in economic activity, the Government denies it.  The SEC doesn't—because it can't.  The Court should make no mistake about the scope of the SEC's claimed authority.  The SEC *admits* that its interpretation of the Exchange Act can be "'synthesized'" into a simplistic four-part test; that the "detail[s]" of Kramer's trading—the "conversion rates," "new shares," meals at the St. Regis—are *immaterial* to that test; and that all that matters is that Kramer "regularly" "buy[s]" and "sell[s]" securities.  Opp. 6, 9 n.4.  Taken together, these admissions show that the SEC's position is, frankly, nuts.  If any person who "(1) bought and sold securities, (2) as principal," "(3) as part of a profit-seeking enterprise, and (4) on more than a few isolated occasions" (Opp. 6) were really a "dealer" required to register with the SEC, then *every* hedge fund, investment company, and family office is—and always has been—an unregistered "dealer."  That is a crime subject to 20 years in prison.  *See* 15 U.S.C. §§ 78o(a)(1), 78ff(a).  And the SEC (it says) can disgorge their "gains" and seize their "securities" (Compl. at 33)—a multi-*trillion*-dollar bounty.  The SEC does not deny *any* of this.

The SEC instead asks this Court to "ignore" it.  Opp. 17.  But this Court is not required to stick its head in the sand.  That "the statute *would* apply so broadly . . . is the inescapable conclusion of the Government's position."  *Bond v. United States*, 572 U.S. 844, 862 (2014).  And that the SEC is forced, in effect, to *advocate* an equal-protection violation is proof that the agency cannot be right.  If Kramer *were* a "dealer," the SEC would not be pressing a legal theory so clearly overbroad its own lawyers have disavowed it in another pending case.  *See* Ex. 1 at 20–21.  And it would not be forced to tout "'absolute [enforcement] discretion'" or load the dice with talk of broadly construing "remedial" statutes.  Opp. 11, 21.  This is a *criminal* statute.  *See* 15 U.S.C.

§ 78ff(a).  And even in this civil case, the Commission is seeking "the securities industry equivalent of capital punishment."  *Saad v. SEC*, 718 F.3d 904, 906 (D.C. Cir. 2013).  So the agency's suggestion that (wink-wink) it won't use its "discretion" to target *others* besides "microcap convertible lenders" doesn't cut it.  Opp. 19, 24.

Neither the Exchange Act nor the Fifth Amendment leave virtually every participant in the financial system to "the mercy" of SEC lawyers.  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 255 (2012).  Courts do not construe a penal statute on the assumption the Government will "'use it responsibly.'"  *Dubin v. United States*, 599 U.S. 110, 131 (2023).  Simply, the SEC is "not free to 'adopt'" an "'unreasonable interpretatio[n]'" *here*, just because it promises to selectively enforce it "'to mitigate the unreasonableness.'"  *UARG v. EPA*, 573 U.S. 302, 328 (2014).  The need to make such a promise is a sure sign the SEC has taken "a wrong interpretive turn."  *Id.*

Also revealing is the SEC's inability even to *describe* the agency's position in a coherent fashion.  The SEC, right now, is telling two federal courts *three* contradictory stories about the same case, p. 8, *infra*; it is urging positions here that the agency has previously rejected, pp. 8–9, *infra*; and is pressing upon this Court a gaggle of non-binding decisions (Opp. 8) with reasoning the SEC refuses even to defend, p. 9, *infra*.  Those cases make claims about the Exchange Act that are provably false (Mot. 21–22); rely on factual distinctions that the SEC now abandons (Mot. 19–20; Opp. 9 n.4); and advance conclusions about "underwriting" that binding regulations refute (Mot. 22).  Again, the SEC has no response to *any* of this.

Ultimately, this case has nothing to do with dealer registration.  At one point, the SEC refers to "*unregistered* microcap convertible lenders," Opp. 19 (emphasis added), implying there are *registered* ones.  There aren't.  Convertible lending has been around since the '90s.  Ex. 2 at 1 (Uyeda, dissenting).  Since 2007, the SEC has reviewed *thousands* of disclosures concerning

*billions of dollars* of loans. Mot. 16. The SEC has litigated against convertible lenders for decades—and even come to their defense. *See* Ex. 3 at 1; Ex. 4 ¶ 33; Exs. 5–6. The *only* guidance on the SEC's website about "Broker-Dealer Registration – Dealers" (Ex. 7 at 12) agrees convertible-lenders are not dealers. Mot. 23–24. And the SEC has long known Kramer is a "penny stock financier" who trades "billions of shares." Ex. 8 at 1. Yet *no one*—literally, not one lender, ever—has registered. The SEC would have the Court believe that every previous SEC overlooked this until three commissioners tried—but failed—to repeal the rule authorizing such lending. Mot. 1, 6. There's a simpler explanation: the SEC's made-for-convertible-lending-only theory is wrong, and its selective enforcement unconstitutional.

The SEC does not want to *regulate* microcap convertible lenders. It wants to *destroy* them. The SEC does not and cannot identify "dealer" regulations applicable to microcap lenders. Mot. 13. If registration were the objective, the SEC would simply require it, as it has for others (with a "one-year grace period" (Opp. 24))—not try to bankrupt *every* microcap lender. Rather, the SEC's theory is a pretext for three commissioners' desire to eliminate the only financing available to the small, unlisted companies they dislike. The SEC's own economists agree that eliminating microcap lending will "prevent" small, unlisted companies "from obtaining financing"—*i.e.*, bankrupt them and wipe out their shareholders. 86 Fed. Reg. 5063, 5073 (SEC Jan. 19, 2021). That's the opposite of "investor protection," Opp. 22 n.27, but it's why the SEC has targeted only "microcap" lenders, Opp. 19—even though no one in the broader convertible lending market is registered, despite loans to listed companies dwarfing microcap loans. *Cf.* Ex. 9 (billion-dollar loan to listed company). The Court should dismiss the complaint.

## ARGUMENT

**I.  A.**  What the SEC calls a "distract[ion]" (Opp. 17) is really a revelation: It is not

"plausible" "an entire industry"—*every* hedge fund, investment company, and family office—has been operating unlawfully since 1934, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012); that "millions of [these firms'] otherwise law-abiding [employees] are criminals," *Van Buren v. United States*, 593 U.S. 374, 394 (2021); and that every previous SEC "overlooked" this, *Bankamerica Corp. v. United States*, 462 U.S. 122, 130–31 (1983). The SEC asks (Opp. 17) the Court to "ignore" this reality, but statutes are not "chameleon[s]," with "different meanings in different cases." *United States v. Santos*, 553 U.S. 507, 522–23 (2008). Courts must ask how a statute "*would* apply" under the "Government's position." *Bond*, 572 U.S. at 862. If Kramer is a "dealer" because *he* "bought" and "sold securities," acted as principal as part of a "profit-seeking enterprise," and did so "on more than a few isolated occasions" (Opp. 6–7), then so, *too*, is every hedge fund, investment company, and family office. The SEC doesn't even try to deny it.

**B.** All the traditional tools of statutory construction undercut the SEC's interpretation.

**1.** Far from "ignor[ing] the statutory definition" (Opp. 10), Kramer honors it. In reading statutes, the Supreme Court "frequently considers the ordinary meaning" of the "defined term." It's *part* of the definition. *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1124 (9th Cir. 2024). This is not "curious." Opp. 11 n.7. It's common. Mot. 8; *see U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 995 (D.C. Cir. 2024); *Indep. Cmty. Bankers of Am. v. Nat'l Credit Union Admin.*, 2017 WL 346136, at *10 (E.D. Va. Jan. 24, 2017) (ordinary meaning "supplies the distinction not expressly stated in the . . . statutory definition"). None of this turns on "constitutional" concerns. Opp. 11.

The SEC counters with cases favoring a statutory definition over an ordinary meaning *at odds* with the definition. Opp. 10. That's not this case. At best for the SEC, "the terms contained in the definitio[n]" are "susceptible of two readings, one of which comports with the standard meaning," "one of which does not." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,

515 U.S. 687, 718 (1995) (Scalia, J., dissenting).  In these circumstances, "[i]t should take the strongest evidence" to believe Congress "defined a term in a manner repugnant to its ordinary and traditional sense." *Id.* at 719; *see Borden v. United States*, 593 U.S. 420, 437–38 (2021).[1]

Here, in 1934, *no one* conceived of securities "dealers" outside the context of buying and selling securities from and to customers.  Mot. 7–8.  In fact, Congress defined "dealer" (and "broker") in the *exact* words that have been used for a century to distinguish the two methods by which broker-dealers effect customer orders:  As "broker," the broker-dealer trades "for the account of" the customer, whereas as "dealer," the broker-dealer effectuates the customer's order by taking the opposite side in the dealer's "own account." *Id.* at 9–10.  Congress reinforced this understanding by using the definite article "*the* business"; the term of art "buying and selling"; and the phrase "as *a part* of a regular business." Mot. 11–12.  The SEC has no answer to *any* of this.

Instead, the SEC strains to show that "dealer" lacked a settled meaning.  That effort fails. The SEC's favorite author (Charles Meyer) *admitted* his "opinion" about how dealer might be "construed" (Dkt. 29-10 at 5) *contravened* its "commonly accepted meaning" (Opp. 17).  *See* Dkt. 29-11 at 7 (conceding a reading "broader" than "common usage").  In fact, two years later, the SEC *itself* rejected Meyer's opinion, because a "dealer" trades with "his customer." Dkt. 29-5 at XIV.  Four years after that, Congress adopted the Investment Company Act to *separately* regulate firms "in the business" of "trading in securities," 15 U.S.C. § 80a-3(a)(1)(A)—precisely because such "professional traders" (to use Meyer's words (Dkt. 32-1 at 34)) were *not* dealers, Mot. 21.

Meyer proves the SEC wrong.  He did not say the definition adopted by the SEC here "could" (Opp. 16) capture professional traders.  He said it "will." Dkt. 32-1 at 34.  But for 90

---

[1] *United States v. Jones*, 962 F.3d 1290, 1298 (11th Cir. 2020), *reinstated on remand sub nom. United States v. Jackson*, 58 F.4th 1331 (11th Cir. 2023); *Robinson v. Dep't of Educ.*, 917 F.3d 799, 802–03 (4th Cir. 2019); *STI Pharma, LLC v. Azar*, 613 F. Supp. 3d 152, 168 (D.D.C. 2020).

years everyone agreed that it *doesn't*.  Mot. 17–18.  There are *thousands* of investment companies and "large trading business[es]"—all "professional" traders—and not one of them, *ever*, has registered as a "dealer."  76 Fed. Reg. 46,960, 46,961, 46,964 (SEC Aug. 3, 2011); *see* Mot. 18.

Rather than explain this, the SEC retreats (Opp. 16) to a different treatise.  But Hodges' treatise, too, *defined* a "dealer" as "sell[ing] to and buy[ing] from a client."  Dkt. 29-1 at 361.  The SEC notes his observation that "odd-lot brokers on the [Exchange] floor" "trade only with fellow members" (Opp. 16), but they did so by *executing other member's customer orders*, Ex. 10 at 6 ("customer" "gives the order to" commission broker, who sends to odd-lot broker).[2]

The SEC fares no better in distinguishing contemporaneous caselaw.  It says tax cases arose under a statute "defin[ing]" "dealer" as "buy[ing] and sell[ing]" "to customers."  Opp. 15.  Not true.  Dealer was "not defined by the statute."  *Donander*, 29 B.T.A. at 314.  Rather, the Revenue Commissioner defined dealer, and did so *consistent* with its ordinary meaning—as he was required to do, *Old Colony R. Co. v. Comm'r*, 284 U.S. 552, 560 (1932).  When taxpayers objected as the SEC does now—that this "rea[d]" "customer" into the law (Opp. 13)—courts disagreed because dealer *itself* meant a "merchant" "sell[ing] to customers," *Donander*, 29 B.T.A. at 315.

The SEC turns to "legislative history" (Opp. 14), but the history refutes its theory.  Thomas Corcoran, the Act's principal draftsman, confirmed Congress *adhered* to dealer's "ordinary" meaning.  Ex. 11 at 687 ("like an ordinary dealer").  A "dealer," like a "broker," he explained, made "a profit by merchandising" securities.  *Id.*  "Merchandising" means selling to and buying from "customers."  *Harriman Nat'l Bank v. Comm'r*, 43 F.2d 950, 952 (2d Cir. 1930).  Corcoran

---

[2] Abandoning finance, the SEC cites *Black's Law Dictionary*, Opp. 17 n.16; but customer there is implicit.  *Black's* first citation says "dealers" "keep a store."  *Norris Bros. v. Commonwealth*, 27 Pa. 494, 495 (1856).  Traders on an exchange, by contrast, aren't dealers, because, *unlike stores*, they don't "sell to customers."  *Donander v. Comm'r*, 29 B.T.A. 312, 314–15 (1933).

was confronted with the exact theory the SEC presses here—that the Act supposedly focuses on the "regularity" of transactions (Opp. 14), where an investor "buys stock, and the next day he comes in and buys some more; the next day he sells some, and back and forth." Ex. 12 at 6581. Corcoran rejected this as "not" consistent with dealer's "normal interpretation." *Id.* And when a witness voiced "concer[n]" that the Act "could be interpreted more broadly than [Congress] intended," Opp. 14—such that (as the SEC argues now) a person could be a dealer by buying 100 "shares of stock one day," selling 100 "shares of stock the next," and that being "his only business," Ex. 12 at 6727—others explained that this reading was "very exaggerated," *id.*, and "not possibly" correct, Ex. 11 at 154.

**2.** With no plausible textual support, the SEC calls *Kramer's* reading "incompatible" with the "regulatory scheme." Opp. 11. But it's the *SEC's* "broad" definition (*id.*) that destroys vital protections. Kramer, like *every* hedge fund, trades *through* broker-dealers; he's *their* customer. Mot. 13. But if he becomes a broker-dealer, his protections as a customer evaporate. Ex. 13 at 2 (Peirce, dissenting). And there's no corresponding benefit: Because he doesn't effect customer orders, "dealer" regulatory provisions don't apply to him. Mot. 13. The SEC still identifies none.

The SEC misreads other provisions. It cites Section 11(d), which requires disclosures "if the transaction is with a customer." Opp. 13. This provision *presumes* dealers execute customer orders. Broker-dealers trade with *other* broker-dealers as *part* of facilitating customer orders—*e.g.*, to facilitate a buy, the broker-dealer buys from another broker-dealer, then sells to the customer, Dkt. 29-6 at 266; Section 11(d) regulates the customer leg. The SEC also contends that Kramer's reading would render superfluous what it calls the "trader exemption" (Opp. 12)—the statute's exclusion for those who buy and sell "but not as a part of a regular business," 15 U.S.C. § 78c(a)(5)(B). But Kramer's reading gives that exemption full effect. "Regular" means

"regular"; if a firm *occasionally* deals, it is not a dealer. It's *the SEC* that creates a surplusage problem, failing to account for the phrase "part of." Mot. 11.[3] And its assertion that § 78c(a)(5)(B) "exclude[s]" "[t]raders" is perplexing (Opp. 12), because "if" the SEC's present reading "is correct," then "traders" *are* "dealers," Dkt. 32-1 at 34. The SEC's position is self-refuting.

**3.** Turning to precedent, the SEC recasts unfavorable case law as focused on the "isolated" nature of trading, not the lack of investor customers. Opp. 9–10. But the cases say what they say. *Radzinskaia v. NH Mountain, LP*, found "Defendants cannot be 'dealers'" because there was no "investor client-professional relationship." 2023 WL 6376457, at *5 (S.D. Fla. Sept. 29, 2023). Other cases (Opp. 9 n.5) say the same thing. And contrary to the SEC's claim, the courts had clear "visibility" into the investors' activities (*id.*); they *acknowledged* the trading's "regular[ity]," *Oceana Capitol Grp. v. Red Giant Ent. Inc.*, 150 F. Supp. 3d 1219, 1226 (D. Nev. 2015).

The "loose citation[s]" are the SEC's. Opp. 9. Take *SEC v. Ridenour*, 913 F.2d 515 (8th Cir. 1990). The SEC is telling two federal courts *three* contradictory stories. First, *Ridenour* "involve[d] brokers not dealers." Dkt. 24 at 3 n.6. Second, *Ridenour did* involve dealers; in fact, the court "found customer-order effectuation to be a factor *supporting* the conclusion that [Ridenour] was a dealer." Ex. 14 at 8 (emphasis added). And now, *Ridenour* "did not" arise "in the context of customer-order facilitation." Opp. 20 n.20. In truth, and as the SEC *itself* said in *Ridenour*, Ridenour "clearly satisfied" the "criteria" that "define a dealer" because he "regularly engaged in transactions directly with the customers." Ex. 15 at 33 n.37. The SEC's insistence now that Ridenour was a "dealer" because of his "activity" level alone (Opp. 19, 20 n.20) is untenable—virtually every financial professional exceeds "100" bond transactions in "two

---

[3] In addition to "part of" (Mot. 11), the SEC's reading deprives 15 U.S.C. § 78c(a)(71)(A)(iii) of meaning. The SEC says "dealer" *already* means "regularity" of trades. Opp. 14. If that's true, Congress didn't need to expand (71)(A) *beyond* "dealer" to one who "regularly enters into" swaps.

year[s]," 913 F.2d at 516.  And it contradicts what the SEC told the Eighth Circuit:  An "active investo[r] who buys and sells with frequency but does not attempt to attract a clientele" is *not* a "dealer."  Ex. 15 at 33 n.37.  As the Eighth Circuit found, therefore, Ridenour obtained "a regular clientele," "purchas[ing] bonds from one client," selling "to another client."  913 F.2d at 516–17.

The SEC also misreads *Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968).  Yes, the putative dealer there (National) sold "some" bonds.  Opp. 20.  But *every* financial professional sells "some" bonds.  National was a "dealer" because it sold "as a part of its regular business," and *that* business was servicing customer orders.  391 F.2d at 361.  The SEC (again) engages in sleight-of-hand when it asserts that the persons from whom National *bought* bonds ("the churches") were not "customers."  Opp. 20 n.21.  That ignores the key part:  National *sold* to its customers.  Once National received church bonds, it "directed the bond sales program" by selling bonds over-the-counter to customers, 391 F.2d at 361; these retail purchasers were National's "customers," *see* Ex. 16 at 12 (the "purchasers of the bonds [were] 'customers' of [National]").  Selling to *them* was its "principal business."  391 F.2d at 361.

What remains are non-binding decisions (Opp. 8) whose reasoning the SEC refuses even to defend.  Some cases cite "Exchange Act provisions" that purportedly apply to dealers without customers, even though no such provisions exist.  Mot. 22.  Other cases mistakenly call convertible lenders "underwriters."  *Id.*  And still others turn to irrelevant, made-up factors (Mot. 19–20), which the SEC here disavows (Opp. 9 n.4).  The SEC offers only silence in response.

**C.**  The SEC also says Kramer "had customers" (Opp. 17), but that's more sleight-of-hand.  The point is not that broker-dealers *have* customers; it's that they effectuate securities orders *for* customers.  As the SEC told Judge Failla recently, "[i]nvestors in securities markets do not interact directly with exchanges," "but instead are customers of broker-dealers who effect transactions on

9

investors' behalf." Dkt. 29-7 ¶ 40.  The SEC does not allege Kramer does *that* for anyone.

**II. A.**  The Fifth Amendment forbids the Government from "intentionally treat[ing]" *anyone* "differently from others similarly situated." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Yet the SEC here arbitrarily targets all "microcap convertible lenders." *Every* hedge fund, investment company, and family office "satisfies every element of the standard set forth" in the SEC brief.  Opp. 6.  The SEC has charged none of them, and it has not even attempted to articulate a rational basis for that differential treatment.  The SEC's assertion of "discretion" (*id.* at 24) does not "exculpate it from a claim of unequal protection if the unequal treatment" is, as here, "arbitrary and irrational." *Gupta v. SEC*, 796 F. Supp. 2d 503, 513 (S.D.N.Y. 2011).

The SEC denies an "improper purpose."  Opp. 24.  But the purpose is clear:  three (of five) commissioners concocted a pretextual theory to target one—*and only one*—market segment to eliminate legal loans that (contrary to the opinion of these three commissioners) thousands of corporate boards, as fiduciaries, have decided was in the best interests of their shareholders.

**B.**  The SEC's interpretation also violates due process.  The SEC says "key" statutory terms—"person," "engaged in the business," "buying and selling"—"provide a person of ordinary intelligence fair notice that they may be a dealer."  Opp. 19.  That cannot be right; again, under the SEC's reading, those terms describe *every* hedge fund and the like, and none has *ever* registered.

**III.**  The SEC doesn't deny that disgorgement is an "equitable" remedy, or that *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023), forecloses that remedy.  Mot. 25.  It quibbles only that striking disgorgement may be "premature," Opp. 25, but it offers no reason to delay relief given *Govil*, *cf. SEC v. Berry*, 2008 WL 4065865, at *10 (N.D. Cal. Aug. 27, 2008) (striking disgorgement claim).

## CONCLUSION

The Court should dismiss the complaint with prejudice.

Dated:  October 15, 2024                    Respectfully submitted,

                                            /s/ *Marshall R. King*
                                            Marshall R. King
                                            M. Jonathan Seibald
                                            GIBSON, DUNN & CRUTCHER LLP
                                            200 Park Avenue
                                            New York, NY 10166-0193
                                            Telephone: (212) 351-3905
                                            MKing@gibsondunn.com

                                            Brian A. Richman
                                            GIBSON, DUNN & CRUTCHER LLP
                                            2001 Ross Avenue, Suite 2100
                                            Dallas, TX 75201-2923
                                            Telephone: (214) 698-3100
                                            BRichman@gibsondunn.com

                                            *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2024, I caused the foregoing document to be electronically filed with the Clerk of the United States District Court for the Southern District of New York through the Court's CM/ECF system, which shall send notification of such filing to all counsel of record.

*/s/ Marshall R. King*

12